(No. 70704.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RONALD JONES, Appellant.

*Opinion filed June 17, 1993.—Rehearing denied October 4, 1993.*

HARRISON, J., took no part.

Rita A. Fry, Public Defender, of Chicago (Karen E. Tietz and Ronald P. Alwin, Assistant Public Defenders, of counsel, and Suzanne Isaacson, law student), for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and

Renee Goldfarb and Sally L. Dilgart, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

Defendant, Ronald Jones, was found guilty by a jury of murder and aggravated criminal sexual assault in the circuit court of Cook County. Before trial defendant requested a bench sentencing hearing. The trial judge found defendant eligible for the death penalty under the Criminal Code of 1961 (the Criminal Code), section 9—1(b)(6) (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)). At the aggravation/mitigation phase, the judge found no mitigating factors sufficient to preclude the sentence of death. He therefore imposed the death penalty under the Criminal Code, section 9—1(h) (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(h)). The death sentence was stayed (134 Ill. 2d R. 609(a)) pending direct review by this court (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603). We now affirm the convictions and the penalty of death.

## FACTS

The following facts were adduced at trial. On March 9, 1985, Debra Smith (the victim) went dancing with her sister until about 2 a.m. on the early morning of March 10. The two sisters then parted company and the victim went to her apartment at 6941 S. Harper in Chicago. She talked with her live-in fiance, James Roberson, and told him that she was was hungry and was going to go to Harold's Chicken Shack, about 3½ blocks away.

On her way to Harold's, she met her friend Sarah Upton, and they talked for a while. While they were talking a man known as "Bumpy" approached the women, grabbed Sarah, and asked them for 50 cents so that he could buy a drink. Sarah identified defendant as the man who approached them. Defendant is known as

"Bumpy" because of his acne problem. Bumpy held Sarah tightly and again asked for 50 cents. The victim told Bumpy to let Sarah go, and Sarah eventually gave him the 50 cents.

At 5:10 a.m., Detectives Peter Valesares and Al Grestheim received a call regarding a homicide. They arrived at the scene and found the victim's body. She was naked from the waist down except for one sock, she had been beaten, and there were stab wounds to her face and neck. There was a trail of blood leading to the Crest Hotel, which was abandoned, and the soles of her sock and bare foot were dirty, suggesting that she had walked from the Crest Hotel after she had been disrobed. Further investigation showed that there was semen in her vagina and that she was drunk at the time she was murdered.

On May 25, 1985, a 33-year-old woman, B.B., called the police to report that she had been raped at knifepoint. One or two weeks later she identified defendant, who was then arrested on June 4, 1985.

On June 9, 1985, Sarah spoke with police about seeing Bumpy talking with the victim shortly before she was murdered. It was on this day that defendant became a suspect in the Smith case. Three weeks later, on July 1, defendant was released when B.B. failed to show up at the preliminary hearing against defendant for the rape.

In late August or early September 1985, the police received the vaginal swabs taken from B.B., which apparently implicated defendant. The police then began to look for defendant to place him under arrest.

On October 4, 1985, Detectives Steven Hood and John Markham located defendant on the street. Defendant was not violating any laws at that time. The detectives placed him under arrest, and took him to police headquarters. They advised him of his *Miranda* rights

and questioned him about the Smith murder. Defendant initially denied involvement, but later changed his story. In this second version of the events, defendant claimed that the victim had agreed to have sex with him for $10, and they went to the abandoned Crest Hotel. After intercourse he refused to pay her, and she pulled a knife out of her bra. They fought until the victim "apparently got stuck" because she lay still, and defendant got scared and ran away. He later threw away his clothes. Defendant agreed to accompany the police officers to the Crest Hotel, where he indicated all of these events supposedly took place. He later signed a statement basically reiterating this story.

At trial, defendant testified that he did not have intercourse with either Smith or B.B. He denied killing Smith, and claimed that his statements had been coerced by the police through beatings. He testified that the purpose of the trip to the Crest Hotel was so that the police could tell him what happened to make his confession more accurate.

As evidence of the beating, defendant provided pictures of a bump on his head that enlarged after his arrest. The State presented expert and lay testimony indicating that the swelling was actually a sebaceous cyst caused by blockage of a sweat gland. The defendant admitted that he had been treated for an acute acne problem that waxes and wanes and which causes him to "break out in bumps."

The jury found defendant guilty of murder and aggravated criminal sexual assault. At the sentencing hearing, the judge found him eligible for the death penalty and, finding no mitigating factors sufficient to preclude the imposition of the death penalty, sentenced defendant to death. This direct appeal followed.

## TRIAL ERRORS

Defendant alleges that there were nine errors committed at trial that warrant reversal of his conviction.

The first error alleged by defendant is that the trial court wrongfully denied his motion to quash his arrest. This motion was based on his allegation that the police officers acted without probable cause when they arrested him. Further, since the arrest should have been quashed, the statements that he gave to police as a result of that arrest were erroneously entered into evidence as fruit of the poisonous tree.

Probable cause is established when police " 'have knowledge of facts which would lead a reasonable man to believe that a crime has occurred and that it has been committed by the defendant.' " (*People v. Wright* (1985), 111 Ill. 2d 128, 145, quoting *People v. Eddmonds* (1984), 101 Ill. 2d 44, 60.) The trial court's decision that probable cause was established will not be disturbed unless manifestly erroneous. *People v. Clay* (1973), 55 Ill. 2d 501, 505.

At the hearing on defendant's motion, Detective John Markham testified that he and Detective Steven Hood arrested defendant on October 4, 1985, less than a half a block away from where the victim's body had been found. Before the arrest, they knew that Sarah Upton had met and talked with the victim and defendant shortly before the murder. They knew that defendant grabbed Upton that night and demanded money, and asked them, "[A]ren't you afraid walking down the streets at night, don't you know people get killed?"

Markham also testified that defendant was believed to have robbed and raped B.B. about three months after the murder, and that the rapes occurred under similar circumstances, including the location (the B.B. rape took place about a block and a half away from the Smith

rape), the time (both rapes occurred at about 3:30 a.m. on a Sunday morning), the race and age of the victims (both were black women in their late twenties) and the fact that both rapes were performed at knifepoint in an abandoned building. Defendant's identity was not in doubt, as B.B. unequivocally identified defendant in a lineup. Detective Markham testified that while defendant was in custody they took blood and colon specimens from him, but did not interview defendant because they felt that interviewing him while in custody for the B.B. rape would not be the right thing to do. At trial, it came out that B.B.'s vaginal swab did not come back until late August or early September, at which time the police began looking for defendant.

Finally, Markham testified that the police learned from neighbors that defendant frequented the area of the crime and they knew of his extensive criminal record. All of this information made him a suspect in the Smith rape and murder.

This knowledge more than adequately supports defendant's arrest. Although this information alone would certainly not be enough to convict a man, it easily establishes probable cause.

Defendant makes much of the time lapse between the arrest for the B.B. rape and the October arrest for the Smith rape and murder. He argues that the police did not know any more information in October than in June. Therefore, there was no basis for the arrest.

This argument misconstrues the issue to be resolved. The issue is not whether the arrest occurred at the earliest possible moment in time. Rather, the issue is whether, at the time of the arrest, the police had facts which would lead a reasonable man to believe that a crime had occurred and that it was committed by Ronald Jones. We conclude that they did. Further, defendant's argument ignores the fact that the B.B. vaginal swabs

were not received until late August or early September. The trial court's determination that there was probable cause to arrest defendant was not manifestly erroneous, and we will not disturb that decision.

Defendant's next two allegations of trial error concern the admissibility of evidence that defendant raped another woman. First, he argues that allowing this evidence was error because no *modus operandi* was shown, making the evidence prejudicial but not probative. Second, he argues that the judge improperly instructed the jury that the evidence of the other rape could be considered evidence of common design.

"The law distrusts the inference that because a man has committed other crimes he is more likely to have committed the current crime." (*People v. Lehman* (1955), 5 Ill. 2d 337, 342.) However, evidence of other crimes committed by the accused may be admitted if it is probative of motive, intent, identity, absence of mistake or accident or the existence of a common design or plan or *modus operandi*. (*Lehman*, 5 Ill. 2d at 342-43.) "[I]t has been broadly held that evidence of other offenses is admissible if relevant for any purpose other than to show propensity to commit a crime." *People v. McDonald* (1975), 62 Ill. 2d 448, 455.

Defendant is correct in asserting that evidence of the other rape could not come in under a theory of common design. "Common design refers to a criminal scheme of which the crime charged is only a part. [Citation.] The several crimes must have some degree of identity between the facts of the crime charged and those of the other offense in which the defendant was involved." (*People v. Rose* (1990), 198 Ill. App. 3d 1, 7.) Since the two rapes were not portions of one larger crime, but rather two separate and independent crimes, the trial court incorrectly instructed the jury that it could consider the B.B. rape as evidence of design.

However, this does not necessarily compel reversal. Other-crimes evidence that is admissible for one reason is not affected by inadmissibility for another reason. (*People v. Carter* (1967), 38 Ill. 2d 496, 504.) When jurors receive a limiting instruction that permits them to consider evidence for a number of reasons, and one of those reasons is determined on appeal to be improper, judgment of conviction must be affirmed despite the overly broad instruction.

Here, evidence of the B.B. rape was properly received to show the rapist's *modus operandi*. The rapes of Smith and B.B. had enough similarities that a judge, in his discretion, could conclude that the B.B. rape demonstrated a pattern or "signature," rendering evidence of that rape probative of the *modus operandi* used by Smith's assailant. Both crimes involved sexual assaults on single, black women in their late twenties. Both rapes occurred at about 3:30 a.m. on an early Sunday morning during the spring of 1985. The rapes were committed less than three months apart, and less than two blocks away, in the area where defendant had lived most of his life. Both women were raped on the first floor of an abandoned building. Both women were struck in the face, and both had their clothing removed forcibly. Finally, both women were raped at knifepoint.

The totality of these factors was probative of the guilty man's pattern of behavior, and was properly presented to the jury to establish the *modus operandi* of the assailant. The behavior was linked to defendant through the identification testimony of B.B. Since the evidence was admissible to show *modus operandi*, the trial court's overbroad instruction concerning common design was harmless.

Defendant's final allegation of trial error inherently alleges sentencing error as well. He argues that the State failed to prove the *corpus delicti* of the offense of

aggravated criminal sexual assault, thus requiring reversal of his conviction. Further, since the sexual assault was the only factor in aggravation establishing his eligibility for the death penalty, the sentence of death was also inappropriate.

To begin, it is important to understand the nature of defendant's *corpus delicti* challenge. With such a challenge, a defendant alleges not that the State failed to prove him guilty of the crime beyond a reasonable doubt. Rather, a defendant alleges that there is insufficient evidence to show that the crime occurred at all.

Defendant's argument is certainly unorthodox. A *corpus delicti* challenge is ordinarily raised when the State has little else besides a defendant's confession to prove that a crime has occurred. The State need not prove *corpus delicti* beyond a reasonable doubt with evidence entirely independent of the confession. Rather, "if the independent evidence *tends* to prove that an offense occurred, then such evidence, if corroborative of the facts contained in the confession, may be considered along with the confession in establishing the *corpus delicti*. In such event, the independent evidence need not establish beyond a reasonable doubt that an offense did occur." (Emphasis in original.) *People v. Willingham* (1982), 89 Ill. 2d 352, 361.

This court has on one previous occasion addressed the issue of whether the *corpus delicti* for rape could be established when the victim was murdered. In *People v. Mahaffey* (1989), 128 Ill. 2d 388, defendant confessed to raping and murdering a woman, and was later convicted, *inter alia*, of rape and murder. He argued to this court, *inter alia*, that the State had failed to prove the *corpus delicti* of rape.

The court disagreed. After noting that the victim had been found clad only in a nightgown with no underpants and that a vaginal swab taken from her tested positive

for sperm, as well as taking notice of defendant's confession itself, the court concluded that there was evidence tending to show that a rape occurred.

Similarly, the victim in the instant case was found naked below the waist, with her clothes strewn about the abandoned building, and with sperm present in her vagina. There is ample evidence tending to show that the victim was raped on the night she was murdered.

Defendant seeks to distinguish *Mahaffey*, which seemingly is directly on point, on the single fact that defendant in this case never confessed to the crime. This argument is unpersuasive. The *Mahaffey* court did not rule that, absent a confession, the *corpus delicti* of rape could not have been proven. Rather, the confession was simply one piece of a large body of evidence tending to show the existence of a rape. The confession was included in the analysis because it was a part of this body of evidence which, *in toto*, met this low threshold. No one piece of evidence was crucial. Similarly, although a confession in the instant case would bolster our conclusion that the evidence in this case tends to show that a rape occurred, it is not necessary.

Defendant next argues that the trial court erred when it denied his motion to suppress his confession. He alleges that the confession was made following physical abuse by police. He argues that the State failed to meet its burden of showing that an acne bump on his face was not enlarged due to injuries inflicted while defendant was in custody.

At issue is whether defendant's statements were made freely and voluntarily, or whether defendant's will was somehow overborne. Voluntariness is determined by the totality of the circumstances. (*People v. Prim* (1972), 53 Ill. 2d 62, 70.) A trial judge does not need to be persuaded beyond a reasonable doubt that the confession was voluntary, and his resolution of the issue will be hon-

ored unless it is against the manifest weight of the evidence. *People v. Aldridge* (1980), 79 Ill. 2d 87, 93.

The evidence in this case overwhelmingly supports the policemen's claims that no abuse occurred, and the trial judge's conclusion to this end was certainly not against the manifest weight of the evidence. Defendant admitted at trial that he has an acne problem which "comes and goes" and causes him to "break out in bumps." Indeed, Sarah Upton testified that she knew defendant from the neighborhood as "Bumpy."

Dr. Mitra Kalelkar, a physician and deputy medical examiner, testified that the bump at issue was "a textbook picture of a sebaceous cyst" caused by blockage of a sweat gland, and that this sort of cyst naturally increases and decreases in size over time. Dr. Kalelkar also testified that a blow to the face, such as that claimed by defendant, would cause such a cyst to rupture, or at the very least would cause discoloration in the skin surrounding the cyst. Dr. Kalelkar testified that such a blow would not cause such a cyst to swell.

Photographs taken of the defendant after his arrest show no discoloration, and do not portray any evidence of contusion, trauma or injury. We will not disturb the trial court's finding that defendant was not beaten by the police.

Defendant next argues that the trial court erred when it curbed his cross-examination of the two detectives that handled the Smith murder. Defendant claims that the limits hampered his ability to develop his theory of the case: that his confession was the result of the police feeding him information, and was elicited only after beatings were administered. He argues that the limits placed on his ability to cross-examine violated the confrontation clause of the United States Constitution.

A defendant's rights under the confrontation clause are not absolute. Rather, "the Confrontation Clause

guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis in original.) (*Delaware v. Fensterer* (1985), 474 U.S. 15, 20, 88 L. Ed. 2d 15, 19, 106 S. Ct. 292, 294.) A judge retains wide latitude to impose reasonable limits on cross-examination in order to, among other things, assure compliance with established rules of trial procedure and evidence. *Delaware v. Van Arsdall* (1986), 475 U.S. 673, 679, 89 L. Ed. 2d 674, 683, 106 S. Ct. 1431, 1435.

In order to prevail on such a claim a defendant must show that the trial judge abused the wide latitude he is afforded. Defendant in the instant case cannot meet this burden. Defendant relies primarily on sustained objections to his questions during his cross-examination of Detective Markham. Markham was called by the State as a rebuttal witness in response to defendant's allegation that the police beat him. In addition to identifying defendant in court, Markham testified to five facts of substance: that he spoke to Ronald Jones on October 4, 1985; that he was present with defendant off and on from 8 p.m. to midnight of that evening; that he was working with Detective Hood at that time; that Detective Hood never struck defendant; and that he did not tell Detective Hood to avoid hitting defendant in the face because he would bruise.

Due to the limited scope of Markham's testimony, the trial judge disallowed the following questions asked by defendant during cross-examination: when and how long Markham had been assigned to the Smith case; whether he knew on October 4 that Smith had been stabbed four times; whether on October 4 he was as familiar with the case as possible; whether on October 4 he knew that defendant had been held for the B.B. rape; whether he normally responds at the scene of a crime such as the

Smith rape; whether his job is to solve crimes; whether defendant was arrested with the view that this would solve the Smith rape; whether he was frustrated when defendant denied involvement in the Smith rape; whether he had been working on the case for several months at the time of defendant's arrest; whether he had attended classes and seminars on interrogation techniques; and whether he knew of the interrogation technique of isolation.

Objections to these questions were properly sustained. They are not at all relevant to the limited scope of Markham's testimony, which was solely to rebut defendant's assertions of police brutality.

Defendant also alleges that the following two questions asked of Detective Hood during cross-examination were disallowed in violation of the confrontation clause:

> "[Defense Counsel]: And, detective, you're aware of instances in the past where suspects have been physically beaten while in custody, aren't you?
>
> [The State]: Judge, objection.
>
> THE COURT: Sustained. The jury is instructed to disregard that question.
>
> [Defense Counsel]: Well, detective, let me ask you this. If it came out that an officer had beaten a suspect, he could lose his job for that, correct?
>
> [The State]: Objection.
>
> THE COURT: Sustained. You're asking general questions which are not relevant, Mr. Sarley."

Whether police brutality has occurred in the past and the consequences of such conduct have no relevance to whether defendant was beaten in the instant case. The objections were properly sustained, and the confrontation clause was not violated.

Defendant's next argument is that the trial court violated his sixth and fourteenth amendment right to a fair trial when it allowed the jury to view photographs of the deceased. This argument is without merit. Photographs

relevant to any fact in the State's case are admissible even if they are gruesome in nature. *People v. Foster* (1979), 76 Ill. 2d 365, 378; *People v. Fierer* (1988), 124 Ill. 2d 176, 193.

Here, the challenged photographs were probative of defendant's guilt, and certainly relevant to the issues at trial. In addition to proving the fact of death and identity of the victim, they corroborate the testimony of State witnesses who testified to the clothing worn by the victim on the night in question. They corroborate the policemen's testimony that they followed a "trail of blood" to the abandoned hotel where the rape took place. The dirty clothes corroborate the State's contention that the victim had been forced to lie on the garbage-strewn floor of the hotel, and the dirty soles of the victim's sock and bare foot corroborate that she walked from where she was disrobed and stabbed. Finally, the photographs show the victim naked from the waist down. All of these factors are probative evidence, and therefore the admission of the photographs was not error.

Finally, defendant alleges two instances of prosecutorial misconduct at trial, which he claims require a reversal of the verdict. First, defendant charges that the prosecutor improperly implied to the jury that the police investigations showed that the victim was not a prostitute. Second, he charges that the prosecutor made improper statements during closing arguments.

The statements referred to by defendant do not support his contentions. In support of his first argument, defendant points to the following colloquy, where three questions were asked by the prosecutor to rebut defendant's testimony that the police told him that the victim was a prostitute. These questions were disallowed following objections by the defense:

"Q. Now during your investigation of this case, did you submit the fingerprints of the victim, Debra Smith, to obtain a criminal history of her?

A. Well, I didn't submit them.

[Defense Counsel]: Objection, your Honor. Not relevant.

THE COURT: Sustained.

Q. [The State]: Detective, did anything in your investigation show that—

[Defense Counsel]: Objection, Judge. It's going to be the same question in a different way.

THE COURT: Sustained. It would call for a hearsay response.

Q. [The State]: Did you at any time tell the defendant that Debra Smith was a prostitute?

A. No sir, I did not.

Q. Did your investigation show that she had ever been arrested for prostitution?

[Defense Counsel]: Objection.

THE COURT: Sustained. Jury is instructed to disregard the question."

This colloquy did not prejudice defendant.

Defendant next alleges that the prosecutor made six improper statements to the jury during his closing argument. He argues that these statements deprived him of his right to a fair trial under the Federal Constitution's fourteenth amendment and article I, section 2, of the Illinois Constitution.

To prevail a defendant must show that the prosecutor's remarks so infected the entire trial proceedings that they denied him a fundamentally fair trial. *Darden v. Wainwright* (1986), 477 U.S. 168, 181, 91 L. Ed. 2d 144, 157, 106 S. Ct. 2464, 2471.

This court will also reverse a conviction under its plain error rule (134 Ill. 2d R. 615(a)) if a defendant can identify remarks of the prosecutor that were both improper and so prejudicial that "real justice [was] denied or that the verdict of the jury may have resulted from

the error." (*People v. Yates* (1983), 98 Ill. 2d 502, 533.) A prosecutor's remarks will not require reversal if the State's evidence of guilt was "substantial and was not closely balanced." *People v. Henderson* (1990), 142 Ill. 2d 258, 322-23.

Defendant's first allegation of prosecutorial misstatement concerns a rhetorical question asked by the prosecutor: "What is the sister of the deceased supposed to do when she hears on the street about a witness to a crime?" Defendant argues that this was contrary to the evidence, since no one testified whether the victim's sister heard anything on the street, and also that it impermissibly suggested that Sarah Upton was a witness to the crime.

This allegation ignores the context in which the statement was offered. The victim's sister was the State's first witness, and established the victim's identity and the accuracy of the photographs, and related the events of the night in question. The prosecutor reiterated what the sister had testified to, and remarked:

"I don't think the Defense is contesting what happened that night. I don't think they are contesting that Debra Smith went out dancing. They are not contesting that she came home in a cab and that she went up to her apartment. They did make a point about Debra Smith [*sic*] leading the police to Sara Upton [*sic*]. But I ask you, ladies and gentlemen, what is the sister of the deceased supposed to do when she hears on the street about a witness to a crime? She should—

[Defense Counsel]: Objection, Judge. No testimony that she heard anything on the street.

THE COURT: Counsel may argue.

[The State]: She should lead the person to the police, and she did."

It is clear from this testimony that the prosecutor was answering a defense challenge to the sister's credibility, and was arguing that her actions were in fact rea-

sonable. His references to the events that made the sister approach the police, although slightly inaccurate, were clearly referring to facts already established, and not to some new prosecutorial theory that Sarah Upton witnessed the crime, a theory the State chose not to pursue until closing argument. It cannot be said that, had the statements been more accurate, the jury would have decided differently, and defendant has failed to meet the threshold required to prevail with this challenge. Thus, there is no reversible error.

In his second allegation of misstatement, defendant asserts that the prosecutor misstated the evidence and maligned the role of defense counsel by suggesting that he should not have cross-examined Detective Hood. This argument is based on the following portion of the State's closing argument:

"Now, the Detective, *** has to answer questions like, have you heard of the isolation technique? Have you heard of the good guy-bad guy technique? Objection overruled. And he has to answer, even though there is no evidence of isolation in this case. The question was—

[Defense Counsel]: Objection.

THE COURT: Counsel may argue.

[The State]: The question isn't did you isolate him in this case? Did you use the good guy-bad guy technique in this case? It's have you heard of it, so he has to answer. *** Ask yourselves why questions like that that don't pertain to this case were asked. *** Thank God questions are not evidence. Do you think maybe those questions were asked because there is no evidence of beating in this case?

[Defense Counsel]: Objection, Your Honor.

THE COURT: It's a jury question. Objection sustained."

The prosecutor was arguing that several questions asked by the defense were not germane towards the issue of guilt or innocence. He was not arguing that there

should have been no cross-examination, only that the questions asked on cross-examination revealed nothing exculpatory. Although the final rhetorical question concerning whether there was any evidence of a beating may have been improper, any potential error was cured through the sustained objection.

Defendant's third allegation of prosecutorial misstatement occurred shortly afterwards, when the prosecutor commented on the B.B. testimony. Counsel argued:

> "[Y]ou heard from [B.B.] in the State's case. [B.B.] came in here, she testified very clearly, very straightforwardly about the Defendant, the bumps on his face, accosting her on the street at bladepoint, taking her into an abandoned building, sexually assaulting her for hours. I don't think you're ever going to see a woman come in and testify to the facts that she testified to—
>
> [Defense Counsel]: Objection, Judge, to Counsel—
>
> [The State]: —as clearly as she testified.
>
> THE COURT: Objection overruled. Counsel may argue.
>
> [The State]: Through the tears, through the pain of reliving what she had to tell you, she told you what this Defendant did to her. Through cross-examination, she did not fade. The story became even more clear through cross-examination; clear as only the truth could come across from the witness stand. She couldn't walk in here and say that if it didn't happen the way she said it did."

Defense characterizes this as the prosecutor personally vouching for the witness' credibility. This is inaccurate. The prosecutor was merely articulating all the factors that made B.B.'s testimony credible. Such an argument is not improper.

Defendant's fourth allegation of misstatement is that the prosecutor inappropriately explained the felony-murder rule, and how it is different from regular murder, when he argued:

"[Y]ou will receive two Instructions on murder as well. Two different definitions of murder. One is called felony murder, and one is regular murder. The difference is, if you are committing a forcible felony and you kill somebody while you're doing it, the Legislature says we don't care if it's an accident. We don't care how it happened, as long as you did the killing, you're committing a felony. Don't need intent to kill. If you're committing a forcible felony and you kill somebody, you're guilty of murder. No self-defense. You go in to rob a store owner with a gun, demand his money, the store owner says I've got a gun too, points at you and shoots at you and misses, you killed the store owner—

[Defense Counsel]: Objection, Your Honor. These are not facts relevant to these Instructions or applicable to these Instructions.

THE COURT: Counsel may argue.

[The State]: If you killed the store owner but he shot you first, there is no self-defense in felony murder. You're committing a felony. You kill somebody, you're guilty of murder. He drops the gun. It goes off and shoots the store owner and kills him, you're guilty of murder."

Although this is an accurate description of the felony-murder rule in laymen's terms, it is the function of the trial judge to instruct the jury on the law of the case. The objection should have been sustained in keeping with proper trial procedures. However, since the law was not misstated there was no prejudice.

Defendant's fifth allegation of error is that the prosecutor improperly argued that the jury should not be "fooled" by defense counsel. Defendant argues that this raised an issue of good faith of defendant's lawyer. This argument is based on the following portion of the closing argument:

"Please don't be fooled by the defense—

[Defense Counsel]: Objection, Your Honor. It is improper argument that we are fooling anybody.

THE COURT: Counsel may argue.

[The State]: Please don't be fooled by the defense of insinuated beatings. Please don't be fooled by statements like finding Debra Smith naked from the waist down, one sock on and semen in her vagina is not evidence of aggravated criminal sexual assault. Please don't be fooled by questions about isolation and good guy/bad guy when there is no evidence of that in this case. Please don't be fooled by this man's quiet demeanor in this courtroom and on the witness stand. The only two eyes that witnessed the brutal rape and murder of Debra Smith are in this courtroom [and] are looking at you right now."

This did not raise a question of good faith of defense counsel. Rather, it was a proper comment concerning defense characterizations of the evidence. The State had a right to argue what the evidence showed, as did the defendant. This is all that occurred here.

Finally, defendant argues that the prosecutor improperly argued that defendant left a mark on the victim, and since there was no evidence of his leaving a mark on the victim, this is reversible error.

This argument is in reference to the following portion of the State's rebuttal closing argument:

"Counsel told you to disregard or in some way not consider [B.B.'s] testimony. The Judge will instruct you how you should consider it. You can consider it in that there is a common scheme or design in that particular evidence, something that earmarks that man. Nights at 3:00 or 4:00 in the morning. Abandoned buildings. Women in their twenties. Does the Defendant leave a mark on the women that he encounters that way, or the women he confronts that way?

[Defense Counsel]: Objection.

THE COURT: Sustained.

[Defense Counsel]: Ask the Jury to disregard, Your Honor.

THE COURT: The Jury will be instructed to disregard it.

[The State]: The scheme—the scheme that you see with him is a thing you can't [*sic*] consider. The design is something you can consider."

The prosecutor did not argue that defendant was somehow marking up his victim. The question whether defendant left a mark was in reference to the prosecutor's question whether defendant's actions "earmarked" him as the rapist. This argument goes toward *modus operandi* and was not improper. Further, defendant's objection was sustained and the jury was instructed to disregard the question. Any possible error was cured by that instruction.

In light of the foregoing, we hold that defendant was afforded a fair trial. Consequently, the convictions are affirmed.

## SENTENCING ERRORS

The Illinois death penalty statute provides that a convicted murderer may be sentenced to death if any one of 11 specific aggravating factors is proven (death eligibility factors), and there are no factors in mitigation sufficient to preclude the imposition of death. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1.) When considering whether mitigating factors exist, the trier may consider relevant aggravating factors, including the death eligibility factors. Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c).

Defendant alleges four errors at the sentencing hearing, all occurring after death eligibility was established. He claims that one factor was improperly considered in aggravation, and that three factors were not adequately considered in mitigation. We consider these in turn.

Defendant alleges that the trial court committed error when it heard evidence in aggravation that defendant threatened to kill a man whom he robbed five years before the trial. This evidence was produced through a preliminary hearing transcript, because the robbery vic-

tim had since died. Defendant objected on the grounds that he had not had an adequate opportunity to confront and cross-examine the robbery victim at the preliminary hearing.

A prosecutor has wide latitude regarding the introduction of evidence in aggravation. Such evidence need not satisfy the requirements for admissibility at trial; rather, it need only be reliable and relevant. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(e); *People v. Gosier* (1991), 145 Ill. 2d 127, 151.) The determination of whether evidence is admissible at the sentencing phase is within the sound discretion of the trial judge. *People v. Lyles* (1985), 106 Ill. 2d 373, 414.

In this regard, we conclude that the preliminary hearing satisfies this low threshold. The robbery victim specifically identified the defendant as the person holding the gun, and then stated that "[h]e had the gun and said he ought to kill me." He repeated this answer when the defense cross-examined him.

The United States Supreme Court has specifically ruled that preliminary hearing testimony such as that at issue is reliable. In *Ohio v. Roberts* (1980), 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531, the Court was faced with testimony at a preliminary hearing where defendant conducted an examination which took the form of cross-examination. The Court ruled that the testimony bore *indicia* of reliability sufficient for admission at trial. *Roberts*, 448 U.S. at 67-73, 65 L. Ed. 2d at 609-12, 100 S. Ct. at 2540-43.

*Roberts* is dispositive of defendant's challenge. Defendant cross-examined the robbery victim at the preliminary hearing, thus making the testimony admissible even at a trial. It necessarily follows that the testimony met the lower threshold required for admission at a sentencing hearing. See also *California v. Green* (1970), 399

U.S. 149, 165-68, 26 L. Ed. 2d 489, 501-02, 90 S. Ct. 1930, 1938-40.

The three factors in mitigation that defendant asserts were not adequately considered are: the defendant's lack of criminal background until age 27; the defendant's expression of remorse at the sentencing hearing; and the remote possibility that defendant could have been telling the truth.

We reject all three claims. First, a clean record until age 27 is not inherently mitigating. Defendant in this case had a serious criminal record after the age 27, having been convicted on two separate occasions of robbery and a third separate occasion of burglary. He served jail time for all three convictions. The judge ruled that "the fact that you [defendant] chose a path [of] criminality, violent criminality, since attaining [the age of 27] is remarkable and unacceptable as far as mitigation is concerned." Thus, Judge Morrissey considered and rejected defendant's claim, a decision that was certainly within his discretion.

Defendant's second claim is equally meritless. Although the defendant stated that he was "sorry for the grief and the pain that Debra Smith's family had to go through, and [he was] sorry for the grief [his] family had to go through, and that's it," the judge was not under any obligation to believe him. In fact, Judge Morrissey specifically stated that he did not believe defendant. This was within his discretion.

Finally, we reject defendant's argument that the judge erred by not considering the remote possibility that defendant was telling the truth when he stated that he killed in self-defense. Defendant claims that this raised a question of lingering doubt, which is one important reason why juries often refuse to return verdicts of death. At the sentencing stage, the question of guilt or

innocence had been decided and the judge was not under an obligation to retry the issue.

Finally, defendant makes the general argument that, in light of his history and character and his good behavior while incarcerated, the sentence of death was inappropriate.

The determination of the death penalty is decided at the trial level, and that decision will not be overturned as long as it is amply supported by the record. Defendant is a high school drop-out, a drug user and an alcoholic, with previous convictions for burglary, robbery and home invasion. He has had his parole revoked twice for refusal to report to his parole officer. He is now a convicted murderer and rapist. The death penalty is supported by the record, and we will not disturb it. Since there was no error at the sentencing hearing and the death penalty was an appropriate sentencing option for the judge, we affirm the imposition of the death penalty.

## CONSTITUTIONAL ISSUES

Defendant makes four arguments to support his claim that the Illinois death penalty statute is unconstitutional. All four arguments have been considered and rejected in previous decisions of this court. Defendant gives no compelling reason in any of his arguments why these decisions should be reversed or modified.

Defendant claims that the discretion vested in the prosecutor to request a death penalty hearing results in the arbitrary and capricious imposition of the death penalty, thereby making it unconstitutional. This court rejected that argument in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 535-43. We reaffirm that decision today.

Defendant next claims that the death penalty is unconstitutional because it places the risk of nonpersuasion at the sentencing hearing on the defendant. We reaffirm

this court's rejection of that argument in *People v. Kubat* (1983), 94 Ill. 2d 437, 504.

Defendant's third argument is that the death penalty statute unconstitutionally fails to provide sufficient information gathering procedures to insure adequate appellate review. This court rejected this argument in *People v. Williams* (1983), 97 Ill. 2d 252, 266, and we reaffirm that decision today.

Finally, defendant claims that the death penalty statute does not require the sentencer to make the ultimate determination that death is the appropriate punishment. This was rejected in *People v. Stewart* (1984), 105 Ill. 2d 22, 76-77.

### CONCLUSION

In light of the foregoing, the convictions and sentence of death are affirmed. The clerk of this court is directed to enter an order setting Tuesday, November 9, 1993, as the date on which the sentence of death entered by the circuit court is to be executed. The defendant shall be executed in the manner provided by law. (Ill. Rev. Stat. 1991, ch. 38, par. 119—5). A certified copy of the mandate in this case shall be delivered by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein defendant is confined.

*Affirmed.*

JUSTICE HARRISON took no part in the consideration or decision of this case.