SIXTH DIVISION

June 30, 1998 

No. 1-96-2641

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of 

Plaintiff-Appellee, ) Cook County.

)

v. ) No. 95 CR 19606

)

DON HARRIS, ) Honorable

) Michael P. Toomin,

Defendant-Appellant. ) Judge Presiding.

JUSTICE GREIMAN delivered the opinion of the court:

Following a jury trial, defendant Don Harris was found guilty of aggravated criminal sexual assault, criminal sexual assault, armed violence and aggravated kidnapping.  Defendant now contends his convictions should be reversed and a new trial granted because:  (1) the trial court erred in failing to quash the arrest and suppress evidence; (2) the trial court erred in admitting evidence of other crimes; (3) the prosecutor improperly commented on his failure to testify; (4) the trial court erred in allowing evidence and argument as to the complainant's alleged loss of virginity; (5) he was denied his right to confront witnesses; (6) cumulative errors denied him a fair trial; and (7) the sentence imposed was an abuse of discretion and unjust.

For the reasons that follow, we affirm.

On the morning of June 17, 1995, N.G., a 14-year-old girl, awoke around 8:30 a.m.  Her aunt asked her if she would go to the store to buy some milk.  She and her four-year-old male cousin, R.W., walked to the corner store.  On the way home, N.G. saw a man, whom she identified as defendant.  He wore a City of Chicago orange construction worker vest.  He put a gun against her side and said, "[D]o you see this[?]"  She said "yes."  Defendant made N.G. wear some sunglasses that had black tape in the inside of the lens so she could not see.  He led them to his car.  N.G. was saying "no" and R.W. was crying and saying "no.  We want to go home."  Defendant put R.W. in the back seat and N.G. in the front seat.  When he entered the car, he set the gun by his leg.

As he drove, defendant said N.G. fit the description of a girl who stabbed his sister.  N.G. told him that she was not that person.  He asked her where she lived and she gave him a false address.  He asked her for her name and she told him it was Kiki.  He asked her age and she told him 12 years old.  He continued to ask her various questions, including whether she was a virgin.  She replied "[y]es" and he said he would know if she was lying.

N.G. stated that she was crying and the tape on the sunglasses started to loosen so that she could see.  Defendant stopped the car and said, "I think you can see."  He took the sunglasses off, pulled duct tape from his pocket and put it directly on her eyes.  He put the sunglasses back on and started to drive again.  She was able to see some of the streets because the tape on her eyes became wet and started to loosen.  Defendant finally drove to an alley and stopped the car near a garage.

Defendant then pushed the door of the garage open and took them inside.  N.G. could see a vehicle on the first floor of the garage.  It was a dark black or gray car with red lines.  Defendant took them up some stairs.  R.W. was crying and saying "no" and stating that he wanted to go home.  When they reached the top of the stairs, there was an old red couch and he ordered them to sit.  N.G. stated that there were old sales papers, a rolled up carpet, an old gutter, and a lot of dirt and rocks on the floor.

Defendant took her hat and the sunglasses off.  He told her to stand up and to lift her shirt so he could unbutton her shorts.  He could not get them unbuttoned so he told her to do it.  His face was a few inches from her face.  She unbuttoned her shorts and he told her to lie down.  R.W. was still screaming on the couch.  Defendant said that she did not look like she was 12 years old and asked why she was lying.  He pulled her shorts and underwear down.  N.G. was crying.  He then pulled her shirt off over her head and turned her on her stomach.  He told her just go along with it and he would not hurt her.  Defendant took his penis and put it in her vagina.  As she was crying and screaming, he told her to be quiet and threatened to slit her throat.  Next defendant turned her on her back and put his penis in her vagina again.  He told her to hold her legs up and be quiet.  Then defendant ordered her to put her arms around him and hug him.  She did so, and she could feel the gun in his back.  Then defendant took his penis out of her vagina.  He "got mad and jumped up.  He turned to [R.W.] and said, thanks for ruining my fun."

Defendant told her to dress and then walked them downstairs where he pulled the tape off her eyes and threw it on the floor.  He took a blue rag and tied it around her eyes.  He drove them to 54th Street and Wood, which was about four blocks from the store where she had purchased the milk.  He told her that he was glad she had cooperated with him and that she "was the first one he didn't kill."  He walked them to the middle of the street.  He told them to walk home and said that if they turned around he would shoot them.  He threatened to kill them if they said anything.  Then he untied the blindfold.  After she made sure he was gone, N.G. ran with R.W. to her grandmother's house.

When they arrived at the house, N.G. told her aunt what happened and her aunt called the police.  When a police officer arrived, N.G. led him to the garage where the assault occurred.  She identified defendant's vehicle, a gray Riviera.  Later she identified a gun as the one defendant had used during the assault.  N.G. went to the hospital where she was examined by medical personnel and she went to the police station that afternoon and identified defendant from a lineup.

Defendant was charged with various counts related to these events, including criminal sexual assault, aggravated sexual assault, armed violence and aggravated kidnapping.  Defendant moved to quash his arrest and suppress evidence.  

At the suppression hearing, Officer Vernon Mitchell testified that he and other officers were called to defendant's residence on July 17, 1995, sometime after 9 a.m.  They were to assist other officers in the possible apprehension of a criminal sexual assault suspect.  Upon arriving at the scene, he was informed as to the details of the assault as given by N.G.  Officer Mitchell spoke with a person on the street and learned that a man had gotten out of the gray car in front of the residence with a brown paper bag and had gone into the house a few minutes before the other officers had arrived.

The officers rang the doorbell and knocked but did not receive an answer.  A girl, later identified as defendant's daughter Lokeya Caldwell, came to the window on the second floor.  She appeared to be between 11 and 13 years old.  She was visibly upset, shaken and crying.  The officers told her to come to the door and eventually she did so, but she only opened the inner door.  She said she was alone and that her father had locked her in and gone to work.  She closed the door and left the doorway.  The officers began calling to the girl.  They were concerned for her safety and called the fire department.  The officer stated, "We had no idea who was in the house with her, if something was wrong with her or not, so we called the fire department."  He also stated they were aware that the victim had identified the car.  "Maybe he might have been holding her hostage or something like that.  We really weren't sure at all."

When the fire department arrived about five minutes later, they put a ladder up to the window on the second floor and the officers entered the house.  Officer Mitchell found the girl and asked her if she was okay and what was happening.  She was still shaking and crying.  She told him in a whisper "[h]e's in the house."  The other officers proceeded downstairs.  The girl told Officer Mitchell that it was her father who was in the house and he had come in excited, running around with a bag that he was trying to hide, and saying that the police were coming to get him for something he did not do.

In going through the residence, the other officers found a shotgun in the second-floor bedroom under the bed, a "Tek-9" in a closet also in the bedroom and two additional guns in a brown paper bag on the second floor in an oven.  One of the officers heard some noise in the basement and went downstairs to find defendant trying to conceal himself behind the paneling.

Officer Mitchell asked the girl to call her mother.  When Linda Caldwell arrived about 5 to 10 minutes later, the officers explained what happened and why they were there.  Ms. Caldwell signed a form, stating:

"I, Linda Caldwell, give permission to Chicago police officers to search my residence at 5315 South Laughlin on June 17, 1995, and take out of my residence any illegal weapons."

The officers explained to her that the form was to search the house and the other properties.  The officer said she was "very cooperative," stating that she wanted to see for herself.  Ms. Caldwell led them through the yard, moved the family's dogs to allow the officers to pass, unlocked the gates, and let them into the garage.

When they entered the garage, the officers found two pieces of duct tape on the ground, one inside the door and one outside the door, just as N.G. described.  They saw a car in the garage with a red stripe.  They went upstairs and found two orange safety vests, a red couch, carpeting, and crumpled up newspapers.  They also recovered some blue rags and a pair of sunglasses.

Lokeya Caldwell testified that she was watching television in an upstairs bedroom on June 17, 1995, when her father came home and went to sleep.  After about 15 minutes, she went to the window and saw a fire truck and police officers.  One of the policemen called up to her.  She told them that her father was home.  When he asked her to come down and open the door, she woke her father, who told her to go to her room.  The police came into the house through the window.  She was upset, but denied crying.

Linda Caldwell testified that she signed a piece of paper that morning but stated that she was told that she had to sign it to get her property back.  She did not read it before signing and the police did not tell her it was a consent to search form.  No police officer asked her for consent to search her house.  She stated that she refused to open the garage and the officers took her keys and opened the lock.  When asked if she was cooperative, she said, "I had no other choice."

The trial court found the warrantless entry of the home justified because of the exigent circumstances.  The court determined there was a strong showing of probable cause that an offense had been committed and a strong probability that the offender was inside the premises.  Because a weapon was used, it was reasonable to conclude that the offender could be armed and dangerous.  Further, there was another young girl on the premises.  The trial court determined, however, that the officers exceeded the scope of the protective sweep when they looked in the oven and found the bag with weapons.  But, the court ruled, based on the totality of the circumstances, valid consent was given by Mrs. Caldwell and under the doctrine of inevitable discovery the guns from the oven did not need to be suppressed.  The court found it reasonable to conclude that the police would have maintained a further search for the weapon used in the assault after they had gained Ms. Caldwell's consent.  Thus, the court denied the motion to quash arrest and suppress evidence.

The case proceeded to trial, where N.G. and others testified.  Louevetta W., N.G.'s aunt and R.W.'s mother, testified that when R.W. returned that morning he was crying, hysterical and scared.  His eyes were red and puffy as if he had been crying for an extended period of time.  She also stated that N.G. appeared frightened and was shaking and crying.  Her hair was disarrayed over her head and her clothes were dirty.

The court allowed L.E. to testify as evidence of another sexual assault alleged to have been perpetrated by defendant.  L.E. testified that on March 25, 1995, she was 17 years old.  At approximately 9 a.m. she was waiting for a bus when defendant approached and asked if she had change for a dollar.  He grabbed her arm and she felt a gun barrel to her back.  He said, "don't scream or I will shoot you."  He told her to get into his car, a two-door gray Riviera.  He told her to lay her head in his lap.  He moved the gun to the back of her head and proceeded to drive.

Defendant then started asking her personal questions, such as, her name, her age, who she lived with, and where was she going.  He asked her if she had sucked anyone's penis before and she said "no."  He said, "well, you are about to today" and she started crying.  He unzipped his overalls, raised his shirt, and pushed her head down to his penis.  His penis was in her mouth for 5 to 10 minutes.  She told him she could not breath and he told her "he didn't give a fuck, bitch."  He then zipped his pants back up and told her to lay her head back down.  He asked her if she had ever had sex and she said "no."  "He said don't lie to me."  Then he said, "so you are a virgin, huh."  She said "yes."  He said, "you are about to find out."

He stopped the car and made her get out.  He told her to close her eyes and put her hands around him.  She did so, but she could see somewhat.  They went into an abandoned building and he kissed her.  He told her to take her clothes off and to lie down on an old mattress.  He put his penis in her vagina.  He was not able to put it in all the way and her "lower body kind of hopped up."  He told her to shut up and lie back down.  He said he would kill her if she moved again.  Then he put his penis in her vagina again.  After 10 to 15 minutes he got up and told her to dress.  Then he walked over to her and ordered her to hug him.

Defendant then took her out of the building and he told her to get back in the car.  He told her he would kill her if the police ever found out.  He took her to another abandoned building, directed her to remain in the building for at least 10 minutes and left.  Eventually, she came out and walked home.  He had left her about one block from where he had picked her up.  On June 17, 1995, L.E. identified defendant in a lineup as her attacker.  She also identified the gun that he had used.  On cross-examination, she stated that the man who attacked her had on a hood and wore sunglasses.

The defense theory in the case suggested that N.G. consented to having sex.  Defendant did not testify but offered several witnesses.  Desiree Weeks testified that she saw defendant standing by his car near the store that morning.  She stated that she saw a young lady with a little boy approach him and have a conversation for about 30 to 40 minutes.  She saw the lady attempt to open the passenger door of defendant's car, but defendant had to come around to open it.  She saw them sit in the car and converse for another 15 minutes before driving away.  On cross-examination, she admitted that Ms. Caldwell initially asked her to testify and that she had told an investigator that she saw them talking for a few minutes, rather than 30 to 40 minutes.

Irene Scroggins, a bus driver, testified that defendant assisted her that morning at an Amoco station when she locked her keys in her car.  She heard a woman yelling from the front seat of defendant's car, stating that she was ready to go.  There was a small head in the back seat.  On cross-examination, Scroggins admitted that she had said in her statement that the woman that she saw appeared to be in her late twenties or thirties.  She also was not certain of the gender of the person in the back seat.  While Ms. Scroggins was uncertain as to the exact time of these events she stated at one point that she started her work break about 7:40 a.m. that morning and she went to the gas station thereafter.  Other evidence indicated that defendant had driven his wife to work that morning sometime before 8 a.m.

John Davis, defendant's neighbor, testified that he saw a lady and a child in defendant's car parked next to defendant's garage that morning.  He did not see defendant and the lady did not say anything to him as he walked by.  This was several hours before the police arrived that morning.  On cross-examination, Davis admitted that he would not talk to the State's investigators when they came to question him because he had been drinking that day.

The jury found defendant guilty of all charges.  The trial court sentenced him to an extended term of 60 years' imprisonment for the charge of aggravated criminal sexual assault and 15 years for each count of aggravated kidnapping.  The two kidnapping sentences are to run concurrently, but they are consecutive to the aggravated criminal sexual assault sentence, for a total of 75 years.

Defendant first contests the denial of his motion to quash arrest and suppress evidence.  
The constitution of Illinois and the fourth amendment to the United States Constitution in general prohibit police officers from making warrantless entries into private residences.  
People v. Foskey
, 136 Ill. 2d 66, 74 (1990), citing 
Payton v. New York
, 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980).  One exception to the warrant requirement is when the State demonstrates that exigent or compelling circumstances justified the entry.  
Foskey
, 136 Ill. 2d at 74.  Several factors are relevant to a determination of exigency, including whether:

"(1) the crime under investigation was recently committed; (2) there was any deliberate or unjustified delay by the police during which time a warrant could have been obtained; (3) a grave offense was involved, particularly a crime of violence; (4) there was [a] reasonable belief that the suspect was armed; (5) the police officers were acting on a clear showing of probable cause; (6) there was a likelihood that the suspect would escape if he was not swiftly apprehended; (7) there was strong reason to believe the suspect was in the premises; and (8) the police entry was made peaceably, albeit nonconsensually."  
People v. McNeal
, 175 Ill. 2d 335, 345 (1997).

In determining whether the police acted reasonably, the court looks to the totality of the circumstances confronting officers at the time the entry was made.  
McNeal
, 175 Ill. 2d at 345-46 (exigent circumstance justified warrantless search of defendant's garbage can);  
Foskey
, 136 Ill. 2d at 84 (facts insufficient to support warrantless entry for arrest under exigency exception).  This court will not disturb a decision on a motion to quash and suppress unless that decision is determined to be clearly erroneous.  
Foskey
, 136 Ill. 2d at 76.

Defendant contests several of the findings related to these factors.  The record indicates, however, that the officers learned upon arriving at the home that a 14-year-old girl had just been taken by gunpoint and sexually assaulted.  She had led the officers to the residence and identified the vehicle parked in front as the one used by the offender.  The officers learned from a person on the street that someone had recently exited that vehicle and entered the home with a brown paper bag.  While defendant suggests that the officers' testimony was not credible, this court defers to the trial court in that assessment.  See 
People v. Hernandez
, 278 Ill. App. 3d 545, 551 (1996) (Because a court of review is not in a position to observe the witness as he testifies, questions of credibility must be left largely in the discretion of the trial court).  The officers were justifiably concerned about a possible escape and, more importantly, the threat of immediate harm to another little girl whom they could see in the residence and who was crying and upset.

Further, Officer Mitchell testified that it took five minutes for the fire engine to arrive.  These events occurred within a relatively short period of time after the actual assault that morning.  There was not an extensive delay.  The record also indicates that the second-floor window entered was partially open.  Thus, the officers entered peacefully.

Overall, the record supports the trial court's findings as to the factors for consideration.  The conclusion that exigent circumstances justified the warrantless entry is not erroneous.  The trial court did not err in refusing to suppress the items recovered within the scope of this protective sweep.  As noted by the trial court, however, the two guns found in the paper bag in the oven of the second floor would not fall within the scope of this sweep. See 
McNeal
, 175 Ill. 2d at 347 
(warrantless police action must be strictly circumscribed by the exigencies that justify its initiation), citing
 
People v. Abney
, 81 Ill. 2d 159, 173-74 (1980).

Defendant next contends the trial court erred in finding consent to search the garage and to reenter the house.  A person may waive his fourth amendment rights by consenting to a search conducted without a search warrant.  
People v. Gutierrez
, 243 Ill. App. 3d 867, 870 (1993).  The State must prove by a preponderance of the evidence that the consent was voluntarily given.  
Gutierrez
, 243 Ill. App. 3d at 870.  The question of whether a consent to search is voluntary and not the product of duress or coercion is a question of fact to be determined from the totality of the circumstances.  
Hernandez
, 278 Ill. App. 3d at 551, citing 
Schneckloth v. Bustamonte
, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973).  A trial court's determination on this issue will not be disturbed unless it is clearly unreasonable.  
Hernandez
, 278 Ill. App. 3d at 551.

The officer testified that Ms. Caldwell arrived at the residence within 5 to 10 minutes of being telephoned.  The officers explained the situation and asked for consent.  She was very cooperative and stated that she needed to see for herself.  She also signed a form providing the officers with permission to search her residence.  She moved the family's dogs to allow the officers in the yard and opened the lock on the gates and the garage door to allow the search of the garage.  Given the trial court's position for judging the credibility of the witnesses, the court's determination that Ms. Caldwell gave consent to the search of the house and the garage is not clearly unreasonable.

   Defendant also argues that the consent cannot be valid as a matter of law because it was "tainted" by the illegal search performed prior to Ms. Caldwell's arrival.  In 
People v. Flagg
, 217 Ill. App. 3d 655, 659-60 (1991), this court ruled that a valid consent could not be found where the search was conducted prior to when the defendant provided the consent.  However, the search performed prior to obtaining consent was legally permissible (with the exception of the opening of the stove) under the exigency exception.  While defendant claims the officers improperly continued to search the premises after defendant was arrested and before Ms. Caldwell arrived, Officer Mitchell testified that Ms. Caldwell arrived at the home within 5 to 10 minutes after she was called.  Further, defendant does not specify any item recovered during this period that would require suppression.

Defendant also argues that the confrontation with the guns found in the oven invalidated the consent.  "'[C]onsent is ineffective to justify a search when a search or entry made pursuant to consent immediately following an illegal search, 
involving an improper assertion of authority
, is inextricably bound up with illegal conduct and cannot be segregated therefrom.'"  (Emphasis in original.)  
People v. Taggart
, 233 Ill. App. 3d 530, 553 (1992), quoting 
People v. Kelly
, 76 Ill. App. 3d 80, 86 (1979).  In 
Taggart
, 233 Ill. App. at 552, the defendant claimed his consent was invalid where he was shown illegally seized photographs before he signed a consent form.  The court found nothing particularly coercive about the events at the police station where defendant signed the form and stated that the display of the illegally seized photos, "without more, did not convey an apparent authority such that defendant would have believed his consent to be a passive submission to that authority rather than a voluntary relinquishment of a right."  
Taggart
, 233 Ill. App. 3d at 553.

The record does not indicate that Ms. Caldwell's consent resulted from the illegal seizure of the guns from the oven.  Ms. Caldwell arrived home, was informed as to what was going on and consented to the searches.  While she may have known that the officers had seized guns when she signed the form, not all of those seizures were illegal.  She was "very cooperative" and, under the facts presented, her consent was not "inextricably bound up with illegal conduct."

On a similar note, defendant argues that the doctrine of inevitable discovery does not apply because the consent obtained resulted from the fruits of a prior illegal search.  The inevitable discovery exception provides that where the record shows by a preponderance of the evidence that the challenged evidence would have inevitably been discovered by lawful means, the evidence is admissible.  
People v. Shanklin
, 250 Ill. App. 3d 689, 695-96 (1993).  Three criteria must be met:  (1) the condition of the evidence must be the same when found illegally as it would have been when found legally; (2) the evidence would have been found by an independent line of investigation untainted by the illegal conduct; and (3) the independent line of investigation must have already begun when the evidence was discovered illegally.  
Shanklin
, 250 Ill. App. 3d at 696.

The trial court's determination that Ms. Caldwell voluntarily consented to the searches here was not unreasonable.  While she may have seen the officers in her home, that entry was justified under the exigency exception.  This was an untainted line of investigation.  While there was one portion of that search that was illegal, the trial court was aware of that illegality and still determined there was voluntary consent.  As noted, there is nothing indicating that Ms. Caldwell's consent derived specifically from the illegal portion of the search.  As the trial court observed, it seems reasonable that if the officers had not found the weapon in the oven when they did, they would have continued to search and gone back into the residence when they had consent.

Defendant argues that the trial court erred in allowing L.E. to testify as to another alleged assault perpetrated by defendant because this evidence was unreliable.  Before evidence of other crimes can be found admissible, the State must show that a crime took place and that "
the defendant committed it or participated in its commission
."   (Emphasis in original.)  
People v. Thingvold
, 145 Ill. 2d 441, 455-56 (1991).  The State need not prove this beyond a reasonable doubt, but must demonstrate more than mere suspicion.  
Thingvold
, 145 Ill. 2d at 456.

Defendant contends L.E.'s identification was unreliable because her offender was wearing sunglasses and a hood.  In determining whether an identification is reliable, courts have looked to the opportunity to view the criminal, the degree of attention, the accuracy of the prior description of the criminal, the level of certainty demonstrated at the confrontation, and the length of time between the crime and the confrontation.  
People v. Simpson
, 172 Ill. 2d 117, 141 (1996).  L.E. identified defendant as the person who assaulted her in a lineup about two months after the assault.  She denied telling the officers at the lineup that she was uncertain.  She stated that she asked to look at the lineup twice, to make sure that she had "everyone correct."  She also identified defendant at trial, and she identified defendant's gun and car.  We find this evidence reliable.

Defendant contends the evidence relating to this other assault was not relevant and was highly prejudicial.  Specifically, he claims the crimes were not sufficiently similar.  Evidence of other crimes is not admissible for the purpose of showing defendant's disposition or propensity to commit crime.  
People v. Illgen
, 145 Ill. 2d 353, 364 (1991).  Evidence of the commission of other crimes is admissible where it is relevant to prove 
modus operandi
, intent, identity, motive, or absence of mistake.
  
Illgen
, 145 Ill. 2d at 364-65.  The trial court must weigh the relevance of the evidence to establish the purpose for which it is offered against the potential prejudice.   
Thingvold
, 145 Ill. 2d at 452.  The court's ruling as to the admissibility of such evidence will not be reversed absent a clear abuse of discretion.  
Thingvold
, 145 Ill. 2d at 452-53.  When evidence of another crime is offered, there must be some similarity between the other crime and the crime charged to ensure that it is not being used to establish criminal propensity.  
People v. Johnson
, 239 Ill. App. 3d 1064, 1074 (1992).

In 
Johnson
, 239 Ill. App. 3d at 1075, the court found it permissible to admit evidence that a defendant had committed a prior sexual assault to show lack of innocent intent in the sexual assault for which he was on trial.  There, "[b]oth victims were abducted while walking alone on the street and taken to another location; both were grabbed from behind by the neck; and both women were beaten, choked and bitten."  
Johnson
, 239 Ill. App. 3d at 1075.

In the instant case, similarities between the two crimes abound: both victims were young girls, N.G. was 14 and L.E. was 17; they were attacked on the street at gunpoint, in the same general area of the city, and they were driven in a gray Riviera to an isolated location; they were forced to close their eyes or have something placed on their eyes during the attacks; they were asked several personal questions during the car ride, including whether they were virgins and both replied yes; the assaults occurred under filthy conditions; the girls were threatened; they were forced to hug the offender after the assault; they were returned to locations near to where they lived and to where they had been taken; and the assaults occurred on Saturday mornings in 1995.  

The defense suggests that N.G. consented to have sexual intercourse with defendant.  Because this evidence of prior conduct tends to show that defendant did not act with an innocent intent, the trial court did not abuse its discretion in its admission.

Moreover, this evidence was also admissible to show 
modus operandi
.  Evidence of other crimes may be admissible as proof of 
modus operandi
 only upon a strong and persuasive showing of the similarity between the crime charged and the separate offense; there must be a substantial and meaningful link between the offenses being compared.  
People v. Brown
, 199 Ill. App. 3d 860, 879 (1990).  There should be some distinctive feature not common to most offenses of that type.  
Brown
, 199 Ill. App. 3d at 879.  

In 
People v. Jones
, 156 Ill. 2d 225, 240 (1993), the supreme court upheld the admission of evidence that the defendant had raped another woman to show the rapist's 
modus operandi
.  The court found the rapes of the two women to have enough similarities to conclude that the other victim's rape demonstrated a pattern or "signature," rendering the evidence of that rape probative of the 
modus operandi
 used.

"Both crimes involved sexual assaults on single, black women in their late twenties.  Both rapes occurred at about 3:30 a.m. on an early Sunday morning during the spring of 1985.  The rapes were committed less than three months apart, and less than two blocks away, in the area where defendant had lived most of his life.  Both women were raped on the first floor of an abandoned building.  Both women were struck in the face, and both had their clothing removed forcibly.  Finally, both women were raped at knifepoint.

The totality of these factors was probative of the guilty man's pattern of behavior, and was properly presented to the jury to establish the 
modus operandi
 of the assailant."  
Jones
, 156 Ill. 2d at 240.

Because the similarities between these crimes was very strong, the evidence was also admissible to show 
modus operandi
. 

Nonpublishavle material under Supreme Court Rule 23 omitted.

Defendant also contends he was denied his right to a fair trial when the trial court allowed evidence and argument as to N.G.'s alleged loss of virginity.  The State argues that defendant waived this issue.  See 
People v. Enoch
, 122 Ill. 2d 176, 186 (1988).  Defendant objected to this testimony and there was a sidebar at trial.  However, defendant did not raise his specific objection to the introduction of this evidence in his posttrial motion.  He 
made only a general objection to prosecutorial argument.  Thus, the issue is waived.

Plain error analysis may be applied where the evidence is so close that there is a possibility that an error not objected to may have resulted in the conviction of an innocent person or where there are errors of such magnitude that their commission denied the accused of a fair and impartial trial.  
People v. Hernandez-Valdez
, 260 Ill. App. 3d 644, 647 (1994).  While the evidence was not close and we see no significant error depriving defendant of a fair trial, we would not find this issue to warrant reversal even if it was not waived.

The Illinois rape shield statute provides, with certain exceptions, that evidence of "prior sexual activity" of the victim is inadmissible in a trial for criminal sexual assault.  725 ILCS 5/115--7(a) (West 1994).  Neither the defendant nor the State may introduce evidence of a victim's past sexual history.  
People v. Sandoval
, 135 Ill. 2d 159, 170-71 (1990).

The State argues that the evidence as to the victim's virginity was admissible in this case and did not violate the statute because defendant asked for this information during the crime.  While driving, defendant asked N.G. if she was a virgin and she said "yes."  He then stated that he would know if she was lying.  Defendant asked L.E. the same question.  The State argues this evidence comprised the facts of the crime itself and defendant should not be able to shield himself from its impact.

We do not find the evidence offered in this case to be evidence of the victim's past sexual activity.  N.G. and L.E. testified that defendant asked if they were virgins and they said "yes," but they were not asked if they told the truth.  The record reveals that N.G. lied to the defendant about her name, address, and age.  The evidence was offered to show defendant's questioning of the victim as part of the circumstances of his attack.

Moreover, during oral argument defense counsel stated that defendant's argument did not lie with the admission of this evidence, but with the prosector's use of this evidence.  The record reveals that the prosection commented on this evidence as if it were true.  During opening argument the prosecutor stated, "And in that room, ladies and gentleman, [N.G.] lost her innocence forever.  She lost that special moment that people cherish."  Defense counsel objected and the court sustained the objection adding, "[c]onfine yourself to the evidence."  In closing argument, the prosecutor commented further, without objection, on the victim's loss of innocence and virginity.

While the prosecutor's comments went beyond the claimed purpose for the introduction of this evidence, we do not find the comments warrant reversal even if defendant's objection to them had not been waived, particularly in light of the strong evidence of guilt.  See 
Hernandez-Valdez
, 260 Ill. App. 3d at 644 (even if not waived, any error in admitting evidence that sexual assault victim was a virgin was harmless); but see 
People v. Sales
,
 151 Ill. App. 3d 226, 233 (1986) (improper argument regarding victim's virginity, as well as other improper comments, deprived defendant of a fair trial where evidence was not so overwhelming as to render the comments harmless).  We also note that the State's argument did not focus on N.G.'s virginity as evidence that she would not have consented, which was the central defense.  Rather, it focused on the motivations of the defendant or at least the nature of his actions in committing the crime.  Compare 
People v. Kemblowski
, 201 Ill. App. 3d 824, 829 (1990) (admission of testimony that victim was a lesbian was erroneous and prejudicial because her avowed preference for sexual activities with women necessarily affected the jury's assessment of whether she consented).

Nonpublishable material under Supreme Court Rule 23 omitted.

Affirmed.

ZWICK and QUINN, JJ., concur.