THIRD DIVISION
September 17, 2008

1-06-0558

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| EDWARD ISLAND, | ) | Honorable |
| | ) | John J. Moran, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE QUINN delivered the opinion of the court:

Defendant, Edward Island, was indicted by grand jury with eight counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2006)) for the shooting death of Anthony Darring, Jr. Following a jury trial, defendant was found guilty and sentenced to 60 years in the Illinois Department of Corrections. On appeal, defendant argues that: (1) the testimony of four State witnesses should have been suppressed as the fruit of his illegal arrest; and (2) he was not proven guilty beyond a reasonable doubt. For the following reasons, we affirm.

## I. BACKGROUND

On April 8, 1997, at approximately 12:43 a.m., Darring was shot in the doorway vestibule of a two-flat apartment located at 8125 South Peoria Street in Chicago. He died from a single,

through-and-through gunshot wound to the head. The initial Chicago police department investigation compiled the following information, as detailed below.[1]

### A. Information Gleaned From Initial Police Investigation

The initial investigation in 1997 was assigned to Chicago police detectives Rowan, Winistorfer and Bernatek, which revealed that the shooting was gang-related. Based on the investigation, the cause of the shooting was an apparent gang war between the Blackstone and Vice Lords gangs. On the night of the murder, a Blackstone gang member named Jermaine Covington hosted a party at his residence located in "Blackstone territory" at 8125 South Peoria Street. A rival Vice Lords gang member attended the party, causing protest by other Blackstone gang members standing outside of the building. The detectives sought out persons who either witnessed or were involved in the murder.

On April 9, 1997, Chicago police arrested a Blackstone gang member named James Spight, otherwise known as "CJ," for threatening Rashad Wells with a handgun. Spight allegedly told Wells that if he had seen Wells the previous night, he would have murdered him too. The police questioned Spight regarding the shooting. Spight told the police that on the night of April 8, 1997, he was at his house with "Pooh Bear," otherwise known as Djuan Mays, a fellow Blackstone gang member. Spight was released from custody due to insufficient evidence.

---

[1] It should be noted that no written police reports are included in the record on appeal and, therefore, any information gleaned from the 1997 or 2002 police investigation is provided by the deposition testimony of Chicago police detective Michael McDermott, a detective in the Area Two cold case unit who was assigned to investigate the murder in August 2002.

On April 13, 1997, Detective Rowan interviewed Covington, who revealed that on the night of the murder, Blackstone gang members stood outside of 8125 South Peoria and threatened individuals arriving to the party because a rival Vice Lords gang member was in attendance. The building's landlord asked Covington to intervene in order to disperse the "unruly teenagers" causing the disturbance. Covington dispersed those individuals and returned to the party upstairs. Approximately 30 minutes later, Joy Williamson, the sister of Covington's girlfriend, exited one of the bedrooms and asked the partygoers if anyone had heard a gunshot.

Covington told the detectives that Pooh Bear was at the murder scene approximately 30 or 45 minutes before the shooting occurred. Detective Rowan presented to Covington a photograph of Pooh Bear. Detective Winistorfer also questioned Covington, who told the detective that there were at least five people involved in the argument outside his building on the night of the murder. Covington provided three gang names, including Pooh Bear, "Lil Ed," and "Q Ball"; however, the detectives did not learn the real names of those members during the initial investigation.

According to Detective McDermott, who was assigned to the investigation in 2002, six individuals placed Pooh Bear at the murder scene 25 to 35 minutes prior to the shooting. McDermott received this information prior to 2002 from persons wishing to remain anonymous. The detectives did not bring Pooh Bear, Lil Ed, Q Ball, or any additional Blackstone gang members to the police station for an interview regarding the April 8, 1997, shooting. Defendant also was not included in any of the detectives' reports prior to 2002, although Covington identified Lil Ed, which is defendant's gang nickname, as one of the five people outside of his apartment shortly before the shooting.

In sum, the initial investigation revealed that there were five Blackstone gang members causing a disturbance outside of 8125 South Peoria on the night of the murder because they were upset that a Vice Lords gang member had entered their territory. Approximately 30 minutes after they were dispersed by Covington, the shooting occurred. Three of the five Blackstone gang members were identified as Pooh Bear, Lil Ed, and Q Ball, but none of these persons were specifically identified by their formal names.

### B. Information Gleaned From 2002 Investigation

In July 2002, Darring's father contacted Chicago police detective Tom Ares, who renewed the police department's interest in the case. Darring's father publicly complained about the slow progress of the investigation. Detective Ares asked Detective McDermott to assist him in investigating the case further. In addition, an anonymous call was made to the Area Two cold case unit immediately prior to defendant's arrest that provided the names of those involved in the murder.

Detective McDermott learned from his brother, a Chicago police Area Two tactical officer, that Lil Ed was defendant. Detective McDermott also spoke to Darring's father, who told him that Kevin Harris may have been the person who shot and killed his son. Detective McDermott then re-interviewed Covington, who identified Lil Ed as defendant and provided information regarding his whereabouts.

In addition, the information gleaned from Covington's reinterview was corroborated by an interview with Leron Harris, which took place approximately one month prior to defendant's arrest. Leron Harris stated that another Blackstone gang member, Kevin Harris, who is not related to Leron Harris and is otherwise known by his various gang names, Q Ball, "K Ball," and "Big Hands," told

him shortly after the murder that "we killed the man over on I believe it was Peoria."

The detectives also interviewed Charles Levy, who stated that he attended Covington's party and observed a few individuals arguing outside the site of the murder within minutes of the shooting. Levy also identified some of those individuals as Pooh Bear, Lil Ed, and Q Ball.

On August 5, 2002, Detective McDermott, accompanied by Bureau of Alcohol, Tobacco and Firearms (ATF) Agent Canell, arrested defendant as he was exiting the Cook County circuit court in Bridgeview. Defendant was handcuffed, placed in a squad car and brought to the police station, where he later gave a statement describing his and others' involvement in the shooting of Darring.[2] These others, Spight, Mays, Greg Hill and Kevin Harris, in turn, provided statements that implicated defendant as the shooter after being confronted by the police with his statement.

Detective McDermott and his partner, Detective Rick Lombard, drove in the neighborhood of the shooting later on August 5 and observed Hill walking down the street. Detective McDermott "grabbed" Hill and he allegedly agreed to come with the detectives to Area Two headquarters. Detective McDermott viewed Hill as a suspect and gave him a Miranda warning. Hill was first interviewed by Detective McDermott at approximately 5 p.m. on August 5, 2002.

Detective McDermott also interviewed David Rouse, who provided information regarding Spight's assault of Wells. Based on this information, Detective McDermott sought Spight for an interview.

---

[2] Neither the entire content of the five statements that defendant provided to the Chicago police throughout the course of the investigation nor the times at which they were given can be determined by the record on appeal.

Detective McDermott first had contact with Spight and Mays on August 6, 2002. Detective McDermott considered all of the individuals from the Blackstone gang on the night of the murder as "somewhat involved in that homicide even if they didn't pull the trigger." He observed Spight and Mays walking on 80th Street and South Emerald Avenue. Spight and Mays were both brought to the police station for questioning. Detective McDermott considered Spight and Mays as suspects and, therefore, they were not free to leave. According to Detective McDermott, their initial interview took place sometime before 11 p.m. on August 6, 2002.

After the Leron Harris interview, the detectives also sought Kevin Harris, who provided additional names in his interview, including Levy and Covington. According to Detective McDermott, Kevin Harris's initial interview occurred sometime prior to 11 p.m. on August 6, 2002.

Finally, the detectives located and picked up Russell McGee, otherwise known as "Pee Wee," and interviewed him at the police station. McGee was interviewed sometime prior to 11 p.m. on August 6, 2002.

The statements of Spight, Hill, Mays and Harris are detailed below in chronological order.

1. *Statement of James Spight (CJ)*

Spight gave his statement at Area Two headquarters on August 7, 2002 at 12:35 a.m. Assistant State's Attorney (ASA) Erica Dillon summarized Spight's statement after informing him that she was an ASA and not his lawyer or defendant's lawyer.

Spight stated that in April 1997, he was 15 years old. At that time, he lived with his grandmother at 81st Street and South Emerald Avenue. He was a soldier in the Black P Stone street gang, meaning, he was a low-level gang member.

On April 7, 1997, and the early morning of April 8, 1997, Spight was "hanging out" with some of his friends who were also Black P Stone gang members. He met up with Lil Ed, "Skinny Mo," Pooh, and Big Hands. Spight identified photographs of each of these persons.

Spight stated that at some point in the evening, after dark, the group of five went to Covington's house at 81st and South Peoria Streets. Covington resided at 8125 South Peoria in the first floor apartment. Spight identified Covington in a photograph.

Spight stated that a whole group of Blackstone gang members went to Covington's residence to "holler at him" because he was having a party and invited a bunch of Conservative Vice Lords. The Blackstones and Vice Lords were at war during that time and "it was wrong for [Covington] to be bringing [Vice Lords] into the [Blackstone] Nation."

After arriving at Covington's residence, Covington confronted the group, telling them "nobody was gonna tell him who he can bring into his house." Thereafter, the group of five left Covington's residence and Lil Ed suggested that they go to Pee Wee's house. Spight described Pee Wee as a "Muf Tiff" in the Blackstone gang, which is one step above being a soldier. Spight identified Pee Wee in a photograph. Spight stated that the Blackstone gang kept guns at Pee Wee's house and that the group specifically went to his house to get a gun. While walking to Pee Wee's house, Lil Ed stated that "he oughta just pop one of those mother fuckers." Spight stated this meant that Lil Ed wanted to shoot one of the Vice Lords.

When the group arrived at Pee Wee's house, Spight saw Lil Ed and Pee Wee talking on the porch. Then Pee Wee went inside and came back out with a .45-caliber chrome handgun. Pee Wee gave the gun to Lil Ed, who said that the group should return to Covington's residence.

As the group returned to 8125 South Peoria, Spight "hung back about a house" and Lil Ed and Pooh continued on to the building. Spight stated that "he did not see the dude that got shot walk into [Covington's] building but he was talking to 'Skinny Mo' and 'Big Hands'" when he heard a gunshot coming from Covington's residence. Spight saw Lil Ed running out of the hallway with a gun in his hand, and Pooh ran toward Spight with blood all over him. Thereafter, the group of five split up and Spight and Pooh went to Spight's grandmother's house so Pooh could clean up. Pooh told Spight that Lil Ed "shot this dude for being a Vice Lord." Spight did not know what happened to the handgun used in the murder. Spight agreed that his written statement was true and accurate and that he was not threatened or coerced.

2. *Statement of Greg Hill (Skinny Mo)*

Hill gave his statement at Area Two headquarters on August 7, 2002 at 1:55 a.m. ASA Dillon summarized Hill's statement after informing him that she was an ASA and not his lawyer or defendant's lawyer.

Hill was 17 years of age and a soldier in the Blackstone gang at the time of the shooting. Hill stated that on the night of April 7, 1997, and early morning of April 8, 1997, he was hanging out with Blackstone gang members Lil Ed, CJ, Big Hands, and Pooh. Hill stated that Lil Ed is Edward Island, CJ is James Spight, and that Big Hands is Kevin Harris. Hill did not know Pooh's real name. Hill identified all four friends by photograph.

Hill stated that on the night of the shooting, the group went to "Juju's" house to "holler at him because he was having a party and had invited a group of [Vice Lords]." Hill did not know that Juju was Jermaine Covington. Hill stated that the Blackstones and Vice Lords were at war. Hill

8

recalled that when Juju confronted them outside his building, he got "into a tussle" with Pooh. The group left after a screwdriver fell out of Pooh's back pocket.

The group then went to Pee Wee's house to get a gun. Hill described Pee Wee as a Muf Tiff and that he knew Pee Wee kept guns in his house for the Blackstones. Hill stated that Pee Wee, Pooh and Lil Ed had a conversation on Pee Wee's porch that he could not hear. Pee Wee went inside his house and came back out with a silver handgun that he believed was a .45-caliber weapon. Pee Wee gave the gun to Lil Ed.

While walking back to Juju's house, Lil Ed said "if one of these [Vice Lords] come out woofin' I'm gonna pop one of them," which meant that if one of the Vice Lords at Juju's house upsets them, then Lil Ed was going to shoot one of them. Hill stated that he "hung back about a house" with CJ, and Lil Ed and Pooh followed "some dude" into Juju's hallway. A short time later, Hill heard a shot coming from the hallway. He then saw Lil Ed and Pooh Bear running out with Lil Ed stuffing the silver gun back into his pocket. Following the shooting, the group split apart and Hill returned to his house with Big Hands. Hill did not know what happened to the handgun. Hill agreed that his written statement was true and accurate and that he was not threatened or coerced.

### 3. *Statement of Djuan Mays (Pooh Bear)*

Mays gave his statement at Area Two headquarters on August 7, 2002 at 3:16 a.m. ASA Dillon summarized Mays's statement after informing him that she was an ASA and not his lawyer or defendant's lawyer.

Mays stated that in April 1997, he was 15 years old. On the night of the shooting, he was hanging out with a group of friends who were all Blackstone gang members, including Lil Ed, CJ,

9

Skinny Mo, and Big Hands. Mays provided the real names for each person and identified all of them by photograph.

On the night of April 7, 1997 and early morning of April 8, 1997, the group of five went to Juju's house on 81st and South Peoria Streets. Mays did not know Juju's real name, but he identified him in a photograph. Juju would not let them into his apartment because they were Blackstones and Vice Lords had been invited to the party. Mays stated that the Blackstones and Vice Lords were at war at that time. Mays felt that Juju should not have invited Vice Lords into Blackstone territory. After the confrontation with Juju, the group went to Pee Wee's house on 80th Street and Union Avenue.

While on the way to Pee Wee's, Lil Ed and Big Hands were upset because the Vice Lords were at Juju's party. Lil Ed had a conversation with Pee Wee on the porch. Mays stated that because Pee Wee was a Muf Tiff, he probably had a gun available. Mays did not know Pee Wee's real name, but identified him in a photograph. Mays knew that Lil Ed had received a gun from Pee Wee.

The group then returned to Juju's house and Mays and Lil Ed approached Juju's door. Mays stated that the entire group of five entered the front hallway in Juju's building. They again tried to get into Juju's house, but they were not let in because of the ongoing party. Big Hands, CJ, and Skinny Mo were first to walk out of the building, with Mays and Lil Ed following behind them. When Mays and Lil Ed reached the front door of the building, a "dude" walked into the hallway behind them. As Mays was going to exit, Lil Ed asked Darring "what he was," meaning, he wanted to know Darring's gang affiliation. Darring told Lil Ed he was a Vice Lord and "that's when Lil Ed pulled out a gun and blam fired one time hitting [the] dude in the head."

10

Following the shooting, Mays ran out of the building and went with CJ to his grandmother's house to wash up. Mays stated that he never saw Darring with a weapon of any kind. Mays did not know what happened to the gun because Lil Ed had run off with it. Mays agreed that his written statement was true and accurate and that he was not threatened or coerced.

4. *Statement of Kevin Harris (Big Hands, Q Ball, or K Ball)*

Harris gave his statement at Area Two headquarters on August 14, 2002 at 2:30 p.m. Assistant State's Attorney Michael Yoon summarized Harris's statement after informing him that he was an ASA and not his lawyer or defendant's lawyer.

Harris stated that he has been a Blackstone gang member since he was 14 years old. He identified Lil Ed by photograph, but did not know Lil Ed's real name. Harris also identified CJ, Pooh Bear, Skinny Mo and Juju by photograph, but stated that he did not know their real names.

On the evening of April 7, 1997, and early morning of April 8, 1997, Harris was with Lil Ed, CJ, Pooh Bear and Skinny Mo. The group was going to attend a party at Juju's house. When they arrived, Juju came out and began arguing with Pooh, but Harris did not know what they were arguing about. Harris stated that Juju and Pooh started to tussle. Harris did not remember how the tussle ended, but afterward, the group left Juju's house.

Harris stated that the group then went to a house located at 79th Street and Emerald Avenue. Lil Ed entered the house and exited with a .45-caliber gun in hand. Harris observed Lil Ed put the gun in his waistband. Harris recognized the gun as the same weapon that Lil Ed had possessed on previous occasions. Harris stated that he knew the gun belonged to Lil Ed.

The group then left to return to Juju's house. Harris and CJ separated from the group about

two houses before reaching Juju's house. Harris stated that Pooh and Lil Ed went into Juju's building. Lil Ed had the gun as he walked into the building. A couple of minutes later, Harris heard a gunshot and saw Pooh and Lil Ed run from the building. As soon as Harris saw them run, he ran back to his house. Harris stated that he was not sure if Lil Ed had the gun after the shooting. He did not know what happened to the gun. Harris agreed that his written statement was true and accurate and that he was not threatened or coerced.

Following the interviews of Spight, Mays, Hill and Harris, Detective McDermott re-interviewed defendant and confronted him with their statements. Defendant then gave a fourth statement, in which he allegedly inculpated himself in the murder.

Defendant was interviewed a final time by ASA Dillon, during which a request was made for a body inspection. The inspection revealed Blackstone gang tattoos.

The continuing investigation in August 2002 confirmed the motive of the murder, namely, that the Blackstone gang members were upset that a rival gang member was attending a party in their neighborhood.

### C. Grand Jury Testimony

Each of the men that provided the above statements all testified similarly before the grand jury in August 2002. Each testified that they were treated well by the police and ASAs. Mays testified that he was standing next to defendant when defendant shot Darring. Hill provided additional information regarding a meeting he had with defendant and Mays following the shooting. Hill asked defendant what happened in Covington's hallway. Defendant told Hill that "he shot a Vice Lord in the head because he threw Vice Lord up in his face so he shot him."

Following the grand jury hearing, defendant was charged with eight counts of first degree murder.

Harris provided a recantation statement to defendant's attorney, dated October 8, 2002. In this statement, Harris stated that in August 2002, he heard that the police were looking for him regarding a murder. Harris knew that the police had already picked up CJ, Pooh, Skinny Mo and defendant and questioned them about the murder. He also knew that defendant remained in custody and that the other three were released. Harris stated that the only information he knew about the murder was that it occurred in a hallway at 81st and South Peoria Streets.

Harris stated that he was interviewed by two homicide detectives who told him that he would get locked up for the murder of Darring unless he signed a statement describing him as a witness. The detectives told Harris that he would be in jail for life. At first, Harris told the detectives that he didn't know anything about the murder. He stated that he was locked in a room for hours. The police kept saying that they did not believe Harris and that other people said that Harris was at the scene of the murder. Harris finally agreed to sign the statement because the police told him he would be released and, if he did not sign, he would be charged with first degree murder. Once Harris signed the statement, the police started to treat him better. Harris stated that the police told him to tell the grand jury the same thing. He stated that the first statement and his grand jury testimony were a lie. He was never at the party and never saw defendant with a gun. He stated that he did not know anything about the murder.

### D. Motion to Quash Arrest and Suppress Evidence

On December 16, 2002, defendant moved to quash his arrest and suppress from introduction

into evidence the direct and indirect products of said arrest. Defendant argued that his arrest was made without authority of a valid search or arrest warrant. Defendant also asserted that his conduct prior to the arrest was such as would not reasonably be interpreted by the arresting officers as constituting probable cause that defendant committed or was about to commit a crime. During the arrest and subsequent detention, the police and prosecution became aware of the existence of physical evidence, witnesses and other evidence, all of which were the direct and indirect fruits of the arrest and detention, connecting defendant with the crime. Defendant sought to suppress any physical evidence discovered directly or indirectly as a result of the detention and any statements given during the detention. Defendant also sought to suppress any in-court or out of court identification of him. In addition, defendant sought to suppress any witnesses discovered as a result of the arrest.

The State responded that defendant was not in custody at the time he accompanied Detective McDermott to Area Two headquarters. The State argued in the alternative that, if the circuit court were to find that defendant was in custody, the police had probable cause to arrest defendant. The State also requested an attenuation hearing in the event the circuit court were to find that the police did not have probable cause.

On February 10, 2002, the circuit court conducted a hearing on defendant's motion to quash his arrest and suppress evidence. The hearing consisted of the testimony of defendant and Detective McDermott.

Defendant testified on direct examination that on August 5, 2002, he was exiting the Cook County circuit court in Bridgeview when he was approached by an officer in a blue suit. Defendant

was walking away when he heard his name called. When he turned around, the officer placed defendant in handcuffs and "threw [him] in a car." The officer took defendant to a police station on 111th Street. On the way, the officer told defendant that he was being arrested for questioning and that he should "just say what [the officer] wanted to hear," and if not, "he was going to try to get me 15 years for a gun case I have." The officer did not ask for defendant's consent and did not show him a warrant for his arrest. Defendant testified that he answered the officer's questions, after which he was charged with Darring's murder.

On cross-examination, defendant testified that he cooperated with the police. He agreed that he was helping the police with an investigation. Defendant stated that he wanted to cooperate so that he could go home.

Detective McDermott testified on direct examination that he is a detective employed by the Chicago police department for 25 years. Detective McDermott began investigating the Darring murder in the summer of 2002. Initially, he found that Darring was possibly a member of the Vice Lords and that he went to a party which was considered to be in Blackstone territory. He followed up on the Blackstone gang member nicknames provided in the 1997 police reports, including K Ball, Lil Ed, and Pooh Bear. Detective McDermott gathered additional information that allowed him to obtain the full names of these individuals. After Detective McDermott obtained a third-party admission that these individuals took credit for the murder, he sought each of them for an interview.

Detective McDermott testified that, on August 5, 2002, he went with Detective Lombard and ATF Agent Canell to the Bridgeview courthouse to locate defendant. Defendant was in the Bridgeview courthouse due to a pending state gun charge. It had been determined that based on

defendant's criminal record, he may have been eligible to be charged with a federal offense relating to the state charge. Detective McDermott first observed defendant as he was exiting the courthouse. Detective McDermott then identified defendant at the hearing as the person he saw exiting the courthouse on August 5, 2002.

Detective McDermott stated that he approached defendant outside the courthouse and identified himself. He did not recall whether he took his badge out. Detective McDermott told defendant that he wanted to speak to him in regard to a murder that had occurred several years ago. Detective McDermott stated that defendant told him he would cooperate and that he knew about the crime. Detective McDermott handcuffed defendant, placed him in his unmarked squad car and drove him to Area Two headquarters. Detective McDermott testified that he handcuffed defendant because of his "lengthy background," and because he felt that defendant was accountable for the murder. Detective McDermott stated that he also handcuffed defendant for safety reasons. At no time did defendant tell Detective McDermott that he did not want to cooperate with the investigation.

After arriving at the police station at approximately noon, defendant was advised of his Miranda rights by Detective Lombard. Defendant freely answered questions regarding the investigation, but there were discrepancies in his story. Defendant originally told the detectives that he knew who went to Covington's house and murdered Darring, and which type of gun was used to commit the crime. Defendant provided the detectives with names, but said he was 1½ blocks away when he heard the shot. Defendant told the detectives that, at the time of the shooting, he was selling drugs.

Defendant also told the detectives that some individuals wanted to go to the party and

confront the people at 81st and South Peoria Streets and that they were looking for a gun. Defendant said that he was working security for a different spot, but he did not have a gun with him when he directed these individuals to get a gun from a location where he knew guns were stored. The individuals returned to defendant and showed him the gun. The individuals continued walking for another 1½ blocks and then defendant heard gunshots. Detective McDermott stated that this conversation with defendant took place within 30 to 45 minutes after his initial contact with defendant.

Detective McDermott testified that, later that afternoon, he sought to bring Hill to the police station. Hill told the detectives that defendant told him he killed Darring. Detective McDermott then interviewed defendant a second time regarding the new developments in the investigation.

On cross-examination, Detective McDermott testified that he became involved in the case after Detective Ares received a telephone call from Darring's father. Detective McDermott stated that he also became involved because seven or eight murders occurred in that neighborhood within the same week. Detective McDermott investigated whether all of the murders were connected.

Detective McDermott spoke to Darring's father by telephone in July 2002. Darring's father had received information from Leron Harris that Kevin Harris had killed his son. Detective McDermott interviewed Leron Harris, who told the detective that Kevin Harris bragged about the killing and bragged about having gunshot powder on his hands the following day.

Detective McDermott agreed that in 1997, the Chicago police only had the gang nicknames of persons who were involved in the murder, including defendant, Q Ball and Pooh Bear. Detective McDermott stated that he found out Lil Ed's real name was Edward Island because his brother, a

tactical officer, had dealt with defendant previously and that defendant was the only person named Edward Island living in that neighborhood and fitting the description of the person who was friends with Q Ball and Pooh Bear.

Detective McDermott learned from his reinterview with Covington that Darring was a Vice Lord gang member. Detective McDermott testified that there was a gang war between the Blackstones and Vice Lords. Detective McDermott agreed that there were no eyewitnesses to the shooting who were not gang-related.

Regarding defendant's arrest, Detective McDermott testified that he did not search defendant because defendant already had passed through a metal detector at the courthouse. He did not recall if he completed a pat-down search of defendant. Detective McDermott's purpose for arresting defendant was to see if defendant would "flip" and identify the shooter. Detective McDermott initially did not believe defendant was the shooter. Detective McDermott believed that defendant was accountable in some way and that he "didn't think [defendant] was free to go," because he wanted to gain defendant's confidence and cooperation. According to Detective McDermott, the issue of whether defendant was free to go "was never brought up." Defendant never asked Detective McDermott if he was allowed to leave.

Detective McDermott testified that defendant was placed in an interview room. Defendant told the detectives that he facilitated the murder by informing the shooters of the location where they could get a gun. After the initial interview, Detective Lombard completed a 14-page police report, which is not included in the record on appeal.

On April 28, 2003, the circuit court granted defendant's motion to quash arrest and suppress

18

evidence. The court found that defendant was arrested without sufficient probable cause.

### E. Petition for Hearing on Attenuation

On July 17, 2003, the State filed a petition for hearing on attenuation, arguing that there was no evidence showing defendant's statement was involuntary. The State also argued that the statement of Gregory Hill constituted an intervening circumstance sufficient to purge the taint of the illegal arrest. The State pointed out that Hill was interviewed pursuant to a conversation that the detective had with defendant, but Hill would have been located and interviewed inevitably during the course of the investigation based on statements of other witnesses. The State also asserted that the Chicago police were aware that defendant, Spight, Mays and Harris were present at the murder scene immediately prior to the shooting based on their interviews in April 1997 and August 2002 with Covington, Levy and Wells. Pursuant to the detectives' interviews with Spight and Mays on August 6, 2002, they became aware that Hill was present at the time of the murder and, thus, they would have interviewed Hill during the investigation independent of defendant's statements. The State argued that Hill's statement is admissible because it would have been obtained during the course of the police investigation even if defendant had chosen not to speak to the detectives.

Defendant responded that the police had no knowledge of any association between Hill, McGee and the Darring murder until they questioned defendant. Defendant argued that his illegal arrest irrevocably tainted all the evidence received afterward, including the statements of defendant, Hill, Spight, Mays and McGee and photographs of defendant's tattoos. Defendant asserted that the taint of the arrest was unattenuated by either the passage of time, the giving of Miranda warnings or intervening events.

19

The circuit court did not specify what evidence would be suppressed at trial in its previous ruling on defendant's motion to quash and suppress evidence. At the attenuation hearing on July 29, 2003, the State and defendant sought a ruling regarding whether the statements provided by witnesses following defendant's illegal arrest were attenuated. The State argued that defendant's fourth and fifth statements were attenuated because they were given after interviews of other witnesses who implicated defendant. Defendant argued that all the interviews and statements of the other witnesses should be suppressed as fruits of the illegal arrest.

At the attenuation hearing, Detective McDermott testified on direct examination that on August 5, 2002, he and an ATF agent went to the Bridgeview courthouse to arrest defendant on federal gun charges. When Detective McDermott began investigating this case, he had available to him prior police reports regarding individuals that had either been interviewed or were sought to be interviewed. McDermott again recounted the details surrounding the night of the murder and the 1997 and 2002 investigations.[3]

Following defendant's arrest and initial statement, the detectives spoke to Hill at approximately 5 p.m. on the same day. Hill provided certain information to the detectives, following which, defendant was reinterviewed. Detective McDermott also testified that defendant took a polygraph examination, which he failed. Thereafter, defendant provided a third statement regarding his involvement in the murder. On August 6, 2002, after the detectives interviewed Spight, Mays

---

[3] Much of Detective McDermott's testimony from the attenuation hearing in regard to the information gleaned from the 1997 and 2002 investigations has been set forth earlier in this opinion and, therefore, will not be repeated here. Only new information will be detailed.

and McGee, defendant was reinterviewed again and confronted with their statements, at which time he inculpated himself in the murder of Darring.

On cross-examination, Detective McDermott testified that he brought defendant to the police station because he qualified to have his state gun charges upgraded to federal gun charges and it was his intent to leverage defendant to provide information regarding the murder. Detective McDermott stated that he did not know whether the federal gun charges were ever discussed with defendant during the initial interview because "he came up with it so quick when we got to Area 2 that he was going to cooperate in this murder; so I don't know how that was presented to him by the agent." McDermott testified that there was no warrant for defendant's arrest. He stated that defendant was the first suspect he wanted to bring to the police station for questioning. Detective McDermott never wrote a report for this case.

On redirect examination, Detective McDermott testified that Leron Harris told police officers the day after the murder that Kevin Harris told him he killed somebody who drove a Monte Carlo. Detective McDermott also testified that his interviews of Spight and Mays would have resulted in his search for Hill regardless of the fact defendant implicated Hill during his initial interview. In addition, Detective McDermott would have sought to interview Spight, Mays and Kevin Harris independent of whether defendant was found.

On October 17, 2003, the circuit court ruled that all of defendant's statements to the police were inadmissible, photographs of his tattoos were admissible and all other witnesses' statements were admissible.

### F. Trial Proceedings

Immediately prior to trial, the circuit court resolved preliminary issues, including the status of various witnesses. The attorneys representing Mays, Hill and Spight each told the court that, because there had been no grant of immunity, they advised their clients to exercise their fifth amendment rights if called to testify. Each witness had recanted his earlier grand jury testimony and statement provided to the Chicago police. The court found that each of these witnesses could invoke their fifth amendment rights not to testify.

The State then suggested that each witness be granted immunity to testify consistently with their grand jury testimony. Initially, Mays agreed to testify, but Hill, Spight and Kevin Harris each refused to testify consistently with their grand jury testimony. The court informed counsel for the witnesses that two weeks prior, a circuit court judge had sentenced an individual to 10 years in prison for contempt of court for failure to testify after receiving a grant of immunity. The court stated that, in this case, "if the jury finds you in contempt you will be subject to any penalty the court feels is fair and appropriate due to the circumstances and considering the seriousness of the case in which your testimony is required." Thereafter, each witness agreed to testify and the State agreed to grant the witnesses use immunity pursuant to section 106-2.5(b) of the Code of Criminal Procedure of 1963 (725 ILCS 5/106-2.5(b) (West 2006)).

Covington testified on direct examination that, in April 1997, he was a member of the Blackstone gang. On April 7, 1997, he resided at 8125 South Peoria Street in a first-floor apartment. On that same date, he hosted a birthday party for a friend, Charles Levy. The attendees at the party were drinking and smoking marijuana. During the party, Covington's landlord told him that there

were a few men outside the building making noise. The landlord asked Covington to go outside and tell them to be quiet. Covington saw three to five people standing outside the building. He recognized them as Blackstone gang members. Covington recognized Lil Ed, Pooh, and K Ball. Covington knew at that time Lil Ed was defendant. Covington provided an in-court identification of defendant.

Covington testified that he asked the group to move down the street or to come inside because they were making too much noise. The group then left the premises. Shortly after midnight, Williamson said that she heard some gunshots. Levy and Williamson found Darring's body in the hallway. Covington knew Darring through Levy. Covington testified that Levy was a member of the Vice Lords gang.

On cross-examination, Covington testified that, at the time of the shooting, there was no gang war between the Blackstones and Vice Lords. Covington stated that he did not have an argument with Mays or any of the other Blackstone members standing outside his building that night. Covington stated that he went outside to talk to the group at 4 or 5 in the afternoon, which was before the party began. He stated that, at the time, he was friends with defendant, Mays and Kevin Harris.

Harris testified on direct examination that he formerly was a member of the Blackstone gang and that his nickname was Big Hands. Harris grew up with defendant. Harris provided an in-court identification of defendant.

Harris testified that he also grew up with Spight, Mays and Hill and that all of them were Blackstone gang members. Harris stated that he was not with defendant, Spight, Mays or Hill on the

night of the murder. Harris denied that he and the others went to 79th Street and Emerald Avenue to get a gun. He also denied that he saw defendant and Mays return to 8125 South Peoria Street with the gun and that he heard a gunshot coming from that building. Harris agreed that he is a convicted felon. Harris also agreed that he was charged with contempt in this case for failure to appear after he was served with a subpoena. Harris stated that he did not want to testify in this case.

Harris testified that, on August 14, 2002, he spoke to ASA Yoon and Chicago police detective Paladino. He stated that the ASA and detective already had prepared a statement for him to sign. Harris repeatedly stated that he did not give a statement to the ASA or to the police. He agreed that he initialed and signed each of the pages and corresponding exhibits included in the statement, but testified that the ASA and the police forced him to say certain things that he did not want to say. Harris testified that he was told that he would be locked up in jail and charged with murder if he did not provide the statement. He stated that his grand jury testimony also consisted of statements that the police told him to say. The State then read portions of Harris's grand jury testimony out loud and asked him questions regarding the testimony.

On cross-examination, Harris testified that he was granted immunity for his testimony at trial. He stated that he went to the police station in 2002 voluntarily because he knew that the police wanted to talk to him about the murder. He also knew that the police had spoken to CJ, Pooh and Skinny Mo. Harris knew that they were released after talking to the police. Harris testified that his statement and grand jury testimony were lies.

Hill testified on direct examination that he was a member of the Vice Lords gang at the time of the murder, but he "was cool" with the Blackstone gang. Hill provided an in-court identification

of defendant. Hill stated that he knew defendant "[j]ust by seeing him a lot." He denied that he was in the same gang as defendant.

Hill testified that on the night of April 7, 1997, and early morning of April 8, 1997, he did not remember with whom he was hanging out. He remembered that, at the time of the murder, he was one house away or at a friend's house. He denied that he was with defendant, Spight, Mays and Harris on the night of the shooting. He also denied that he knew Covington. In addition, he denied that he and his friends went to Pee Wee's house to get a gun. Hill testified that he was not present at any time when defendant shot Darring.

Hill also testified that he was charged with contempt in this case because he refused to appear in court after he was served with a subpoena. Hill stated that he was testifying because he was given immunity. He also stated that he was a convicted felon. He agreed that he signed each page of the statement he provided to police, but he did not know what the papers said. Hill testified that he did not provide the information that was included in the statement. He claimed that the ASA copied his statement from another statement previously taken. Hill stated that if he did not agree to provide the statement, the police would charge him with murder. The contents of Hill's statement were read out loud to the jury. Hill agreed to some of the statements that he made, but disagreed with others or stated that he did not remember giving those statements. Hill also denied reading the entire statement line by line.

In addition, Hill testified that he was forced to testify before the grandjJury and was told that if he "mess[ed] one word up on this statement we can charge you with a murder and all of this." The State then read Hill's grand jury testimony to the jury. Hill testified that he lied when giving his

grand jury testimony.

On cross-examination Hill testified that on August 5, 2002, he was picked up off the street by police officers, handcuffed and taken to Area Two headquarters for questioning. He stated that he was kept at the police station until August 7, when he provided the police with his statement. Hill stated that the police did not give him a Miranda warning. The police told Hill that he could be charged as an accessory to murder.

On direct examination, Spight denied that he was a street gang member in April 1997. He stated that he became a Blackstone gang member in 2000 and not before. Spight previously dated defendant's sister. Spight provided an in-court identification of defendant.

Spight testified that he did not know defendant's real name. Spight attended grammar school with Mays. Spight also knew Harris and Hill. He denied that he knew Pee Wee or Juju.

Spight stated that he did not remember what he was doing on the night of April 7, 1997, and early morning of April 8, 1997. He denied that he went to a party with defendant, Hill, Mays and Harris at 81st and South Peoria Streets on those dates. He denied that he and the others went to Pee Wee's house to get a gun. He also denied returning to Juju's" house afterward, that he heard a gunshot and that he saw defendant running from the building still holding the gun.

Spight testified that he was a convicted felon. He also stated that he had a pending case for contempt of court for failure to appear after he was served with a subpoena.

Spight testified that he did not remember speaking to ASA Dillon on the night of August 2, 2002. He agreed that he provided a statement to ASA Dillon and Detective McDermott, and signed each page of that statement, including photographs identifying defendant, Hill, Mays, Harris and

26

Covington. The State then read the contents of the statement to Spight, line by line. Each time Spight was confronted with another part of the statement, he testified either that he did not remember or that he denied providing the information. Spight stated that he did not read the statement as written because he cannot read. He testified that he was forced to sign the statement because police officers beat him up and punched him in the face. Spight stated that the police officers told him that if he did not sign the statement, he would be charged with murder and accessory to murder. When the State confronted Spight with the photograph of him taken after he gave the statement, he agreed there were no bruises on his face. Spight stated that he had knots on his head. Spight testified that he told the ASA he had been beat up by the police. He testified that his statement was a lie.

Spight testified that he did not remember testifying before the grand jury. The State read Spight's grand jury testimony aloud sentence by sentence, pausing each time to confirm with Spight the accuracy of the testimony. Spight answered each time that he did not remember his testimony. Spight admitted that he was granted immunity for his testimony at trial.

On cross-examination, Spight testified that he was testifying at trial because he had been threatened with a contempt charge. He stated that he was not questioned regarding Darring's murder until August 2002.

Dr. John Scott Denton, a forensic pathologist and deputy medical examiner at the Cook County medical examiner's office, testified that it is his duty to determine the cause and manner of death. He has performed over 2,700 autopsies in his career. He reviewed a report of the post-mortem examination of Darring, which was completed by a former deputy medical examiner. Dr. Denton described the gunshot wound on the right side of Darring's head. He testified that Darring was shot

at close range and that the gunshot wound was through-and-through, meaning that it entered the body and then left the body. Dr. Denton testified that, in his opinion, Darring died from a gunshot wound to the head and that the manner of Darring's death was homicide.

Mays testified on direct examination that he was in custody for a pending case of aggravated domestic battery. He agreed that he refused to testify in this case and that he was offered immunity by the State for his testimony. He also agreed that he again refused to testify even after he was offered immunity. He agreed that the circuit court judge admonished him for his refusal to testify. Mays testified that he knew defendant from the neighborhood. Mays provided an in-court identification of defendant.

Mays stated that he was a member of the Blackstone street gang. He stated that defendant also was a Blackstone gang member. He also knew that CJ, Skinny Mo and Big Hands were Blackstone gang members. Mays testified that on the night of April 7, 1997, and the early morning of April 8, 1997, he was at his grandmother's house with Spight playing video games. He did not see defendant, Skinny Mo or Big Hands that night. Mays denied going to Covington's house and denied going with defendant to pick up a gun at Pee Wee's house on April 8, 1997. He denied that he was present in the hallway vestibule of Covington's house when defendant shot someone in the head.

Mays testified that he signed each page of the statement he provided to ASA Dillon on August 7, 2002. He also agreed that he signed each of the attached photographs of defendant and the other Blackstone gang members involved in the murder. Mays testified that he did not agree to give the statement. The State corroborated the contents of the statement with Mays. When questioned

about each portion of the statement, Mays either agreed that he provided the particular statement as read or stated that he did not remember. Mays agreed he provided a statement that when Darring told defendant he was a Vice Lords gang member, defendant pulled out a gun and shot him. Mays testified that the police told him that if he did not sign the statement, he and defendant would be charged with murder. Mays agreed that he told the ASA that he was not made any promises in return for his statement or threatened in any way. In addition, as the State read Mays' grand jury testimony line by line, Mays agreed that he provided the testimony.

On cross-examination, Mays denied that he saw defendant shoot Darring and that a significant part of his statement was made up. Mays also testified that his grand jury testimony was a lie.

ASA Dillon testified that she has been a prosecutor for almost seven years. In August 2002, she was assigned to the felony review unit. On August 6, 2002, ASA Dillon took the statements of Hill, Spight and Mays, who each agreed to have their statements memorialized.

At the time the statements were taken, ASA Dillon had crossed out the section of the statement detailing Miranda rights because none of the witnesses were being accused of any wrongdoing. ASA Dillon reviewed each of the statements with the witnesses and they were allowed to make any corrections as necessary. At the conclusion of each statement, a photograph was taken of the witnesses and attached to the statement. Each of the witnesses, ASA Dillon and the detectives signed every page and photograph included in their respective statements. ASA Dillon testified that she never saw any police officers beating Spight. In addition, she observed no injuries to Spight when he provided his statement. None of the witnesses complained to ASA Dillon that they were

29

threatened by the police. Mays' statement was published to the jury and read aloud to the jury by ASA Dillon.

On cross-examination, ASA Dillon testified that she was not aware the three witnesses already had been given <u>Miranda</u> warnings by the detectives.

ASA Yoon testified that in August 2002, he was assigned to the felony review unit. He stated that he took Harris's statement and that Harris had agreed to give the statement. Prior to memorializing Harris's statement, ASA Yoon met with Harris without any police officers present. ASA Yoon asked Harris how he had been treated and if he had been threatened in any way. Harris told ASA Yoon that he had not been threatened. ASA Yoon then sat at a table with Harris and Detective Paladino and simply asked Harris what happened on the night of April 7, 1997, and early morning of April 8, 1997. ASA Yoon memorialized what Harris told him. Afterward, he reviewed the statement with Harris page by page. Harris, ASA Yoon and Detective Paladino signed each page of the statement and the corresponding photographs. The State then published Harris's statement to the jury, which ASA Yoon read aloud from beginning to end.

The State next called ASA Nicole Morely, who testified that in August 2002, she was assigned to Branch 66, which presents witnesses to the grand jury for indictment. ASA Morely presented Hill, Mays and Spight to the grand jury in this case. ASA Morely met with each of the witnesses separately prior to the grand jury hearing. ASA Morely had reviewed each of the witnesses' statements before meeting with them. When ASA Morely met with Hill, he at no time mentioned that his statement was a lie or that he had been threatened by the police. ASA Morely testified that Hill was very cooperative and forthcoming. In addition, Mays and Spight also did not

tell ASA Morely that they had been threatened by the police. Spight never told ASA Morely that he had been beaten by the police. The State then published the grand jury testimony of each of the witnesses, which ASA Morely read aloud to the jury.

Detective Lombard testified on direct examination that he has served as a Chicago police officer for 19 years. In August 2002, Detective Lombard served as a gang specialist. Detective Lombard previously testified in court as a gang expert. He was familiar with certain specifics pertaining to the Blackstone street gang. The circuit court allowed Detective Lombard to testify as an expert in this case. The State and defendant then stipulated that defendant was a Blackstone gang member in April 1997.

Detective Lombard testified that he took defendant into custody on August 5, 2002. Detective Lombard provided an in-court identification of defendant.

Detective Lombard next testified regarding his interviews of Hill and Spight. Detective Lombard stated that he never threatened Hill or Spight. He was present with ASA Dillon when Hill provided his statement. Detective Lombard also denied that any police officer beat or punched Spight.

On cross-examination, Detective Lombard testified that he had been working on this case for a few months prior to arresting defendant. Before arresting defendant, he considered Harris and Spight as murder suspects. Detective Lombard considered Mays as a witness. Detective Lombard stated that Hill agreed to go to the police station for questioning. Detective Lombard testified that none of the witnesses were being held against their will and that they were at the police station by their own agreement.

On redirect examination, Detective Lombard testified that, as he questioned each of the witnesses, he confronted them with discrepancies, which was normal practice for interviews with potential suspects.

After the State rested, defendant presented no evidence. Following closing arguments, the jury found defendant guilty of first-degree murder. Thereafter, defendant was sentenced to a 60-year prison term.

## II. ANALYSIS

On appeal, defendant argues that the testimony of Hill, Spight, Mays and Harris should have been suppressed because the State failed to prove by clear and convincing evidence that the taint of the primary illegality, namely, defendant's illegal arrest, was attenuated. Defendant also contends that the State did not meet its burden of proving by a preponderance of the evidence that the witnesses' statements and grand jury testimony would have been inevitably discovered through lawful means. In addition, defendant asserts that he was not proven guilty beyond a reasonable doubt considering the only evidence of guilt was the disavowed prior inconsistent statements and grand jury testimony of four alleged accomplices who received immunity before testifying. Defendant argues that there was no corroborating evidence and that the witnesses statements were not made until five years after the murder occurred.

The State responds that the witnesses' statements and Grand Jury testimony were admissible because they were attenuated and would have eventually been discovered. The State argues that it proved by clear and convincing evidence that the witnesses' statements were attenuated from the initial illegality. In addition, the State asserts that it proved by a preponderance of the evidence that

the witnesses' statements would have inevitably been discovered. Finally, the State contends that defendant was proven guilty beyond a reasonable doubt based on eyewitness testimony and other witnesses' corroborating evidence.

A. Whether Corroborating Witness Statements and Testimony Were Attenuated

Defendant argues that Spight, Hill and Mays were each confronted with his illegally obtained statements before they provided their written statements and grand jury testimony implicating him in the murder, which demonstrates a lack of attenuation pursuant to United States v. Ceccolini, 435 U.S. 268, 55 L. Ed. 2d 268, 98 S. Ct. 1054 (1978). In addition, defendant contends that the State presented no evidence of what occurred when police questioned Harris before he implicated defendant in a written statement and before the grand jury. According to defendant, the absence of such proof means that the State failed to establish by clear and convincing evidence that Harris's statement was not tainted by defendant's illegal arrest.

The circuit court's ruling on a motion to attenuate will not be overturned unless manifestly erroneous. People v. Simmons, 372 Ill. App. 3d 735, 742 (2007); People v. Lekas, 155 Ill. App. 3d 391, 415 (1987). The circuit court's decision regarding a motion to suppress evidence is reviewed de novo; however, great deference is given to the circuit court's factual findings, which will not be reversed unless they are found to be against the manifest weight of the evidence. People v. Pitman, 211 Ill. 2d 502, 512 (2004). Notably, "a reviewing court remains free to undertake its own assessment of the facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted." Pitman, 211 Ill. 2d at 512.

Initially, this case is distinguishable on its facts from many attenuation cases because the

circuit court suppressed defendant's incriminating statements due to his illegal arrest. The court allowed the admission of inculpatory statements and testimony provided by certain witnesses at trial because they were sufficiently attenuated from the illegal arrest, which defendant specifically challenges here. Accordingly, we must determine whether the contested witnesses' statements and grand jury testimony were obtained by the exploitation of the illegal arrest and not by means sufficiently distinguishable to be purged of the primary taint of the illegality. See Wong Sun v. United States, 371 U.S. 471, 488, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417 (1963).

The State has the burden of proving attenuation. People v. Foskey, 136 Ill. 2d 66, 86 (1990). The State must establish by clear and convincing evidence that the challenged evidence was obtained by means sufficiently distinguishable to be purged of the primary taint. People v. Watson, 315 Ill. App. 3d 866, 881 (2000).

Under certain circumstances, live testimony should be excluded when knowledge of the witness arose from a fourth amendment violation. In Ceccolini, the Supreme Court clarified its holding in Wong Sung that oral evidence, as well as physical evidence, may be subject to the exclusionary rule. The Court reasoned that, since the cost of excluding live-testimony is often greater than the exclusion of documentary evidence, "a more direct link between the illegality and that kind of testimony is required." Ceccolini, 435 U.S. at 278, 55 L. Ed. 2d at 278, 98 S. Ct. at 1061. The Court further explained:

> "The proffer of a living witness is not to be mechanically equated
>
> with the proffer of inanimate evidentiary objects illegally seized. The
>
> fact that the name of a potential witness is disclosed to police is of no

34

evidentiary significance, <u>per</u> <u>se</u>, since the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give." <u>Ceccolini</u>, 435 U.S. at 277, 55 L. Ed. 2d at 277, 98 S. Ct. at 1060.

In <u>Ceccolini</u>, a police officer (Biro), while taking a break in the defendant's flower shop and conversing with an employee of the shop (Hennessey), noticed an envelope with money protruding therefrom lying on the cash register. Upon further examination, he found it contained not only money, but also betting slips. Biro then placed the envelope back on the register and, without telling Hennessey what he had found, asked her to whom the envelope belonged. Hennessey told Biro that it belonged to the defendant. Biro's finding was reported to local detectives and the Federal Bureau of Investigation, who interviewed Hennessey approximately four months later without referring to the incident involving Biro. Six months after the incident, the defendant was summoned before a federal grand jury where he testified that he had never taken policy bets at his flower shop. Hennessey, however, testified to the contrary and, shortly thereafter, the defendant was indicted for perjury. Hennessey testified against the defendant at his trial, but after a finding of guilt, the district court granted his motion to suppress Hennessey's testimony and set aside that finding. The court of appeals affirmed, noting that the "road" to that testimony from the unconstitutional search was uninterrupted.

The Supreme Court held that the court of appeals erred in concluding the degree of attenuation between Biro's search of the envelope and Hennessey's testimony at trial was not

sufficient to dissipate the connection between the illegality of the search and the challenged testimony. The Ceccolini Court focused on several factors in determining whether the testimonial evidence should be excluded: (1) whether the testimony given by the witness was an act of free will or coercion or induced by official authority as a result of the initial illegality; (2) whether the illegality was used in questioning the witness; (3) how much time passed between the illegality and contact with the witness and between the contact and the testimony; (4) whether the identity of the witness was known to the police before the illegal conduct; and (5) whether the illegality was made with the intention of finding a witness to testify against the defendant. Ceccolini, 435 U.S. 275-78, 55 L. Ed. 2d at 276-279, 98 S. Ct. at 1059-61.

Foremost, the Court said the degree of free will exercised by the witness in deciding to talk to police is not irrelevant. The Court also noted that even putative defendants should be permitted to testify at trial if there is no exploitation of their statements to compel the testimony. See also, People v. Williams, 138 Ill. 2d 377, 397 (1990).

In determining whether the decision to provide a statement is an exercise of free will a court should consider the time, place and manner of the initial questioning of the witness. Another important consideration which differentiates live witness testimony from typical documentary evidence is that to exclude the testimony of a witness "would perpetually disable a witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the originally illegal search or the evidence discovered thereby." Ceccolini, 435 U.S. at 277, 55 L. Ed. 2d at 278, 98 S. Ct. at 1061.

In this case, defendant argues that application of the Ceccolini factors demonstrates that there

was a close and direct link between the illegally obtained statements of defendant and the statements and grand jury testimony of Hill, Spight, Mays and Harris, which resulting taint was not attenuated. Defendant asserts that his illegal arrest was motivated by a desire to locate witnesses. Detective McDermott had learned that defendant, Mays and Harris were allegedly involved in a gang-related disturbance in front of the building where the shooting occurred 30 to 45 minutes later. Detective McDermott testified that he decided to pick up defendant first to induce him to "flip" and name the shooter. Detective McDermott stated that he used the possibility of a federal gun charge against defendant to "leverage" him to provide information. Defendant argues, therefore, that his arrest was a "classic fishing expedition" to establish probable cause to charge someone with the unsolved murder.

In addition, defendant contends that it is unclear whether the contested witnesses' statements and grand jury testimony were the product of free will and the result of a "detached reflection and a desire to be cooperative." Ceccolini, 435 U.S. at 277. Defendant argues that the purpose of the police illegality was to locate witnesses, as each witness was "grabbed" off the street by police, which alerted them to the fact that they were potential suspects in this case. Defendant points out that the contested witnesses were putative defendants who were not likely to have come forward voluntarily because it would have been against their own penal interest to do so.

Defendant acknowledges that police were aware of Spight, Mays and Harris before he was arrested; however, the police did not obtain Hill's name until they interrogated defendant. Also, the police were only aware of the witnesses' gang names and not their real names.

Furthermore, defendant notes the length of time between the illegality and the police contact

with the witnesses – the police arrested Hill within five hours of defendant's illegal arrest, while Spight and Mays were arrested the following day. Defendant argues that, contrasted with the four months between the illegal search in Ceccolini and the contact with the witness, this factor demonstrates a lack of attenuation in this case.

Finally, defendant argues that the fact each witness was confronted with his illegally obtained statements implicating them in the shooting demonstrates a nexus between the primary illegality and the witnesses' statements in violation of the fourth amendment.

In People v. Daniels, 287 Ill. App. 3d 477, 482-83 (1997), quoting Wong Sun, 371 U.S. at 487, 9 L. Ed. 2d at 455, 83 S. Ct. at 417, quoting Nardone v. United States, 308 U.S. 338, 341, 84 L. Ed. 307, 312, 60 S. Ct. 266, 268 (1939), the court noted, "[a]s in all exclusionary issues, the question is whether 'the connection between the lawless conduct of the police and the discovery of the challenged evidence has "become so attenuated as to dissipate the taint." ' " "The touchstone in these cases is 'discovery' of the evidence." Daniels, 287 Ill. App. 3d at 483.

In People v. Rassmussen, 143 Ill. App. 3d 11, 17 (1986), the court found that the discovery of the witness' identity and his subsequent testimony were not the fruit of the illegal search. There, the court noted that the fruit of the poisonous tree doctrine is not applicable to all evidence discovered in an illegal search. The court stated that the fruit of the poisonous tree doctrine does not apply to "(1) evidence discovered from an independent source, (2) evidence sufficiently distant in causal connection from the controverted search and seizure [or arrest as in this case] so that any connection has become so attenuated as to dissipate any taint, or (3) evidence which inevitably would have been found without an illegal search." Rassmussen, 143 Ill. App. 3d at 16. "Satisfaction

of any of the foregoing removes the evidence in question from the purview of the doctrine." Rassmussen, 143 Ill. App. 3d at 16; see also United States ex rel. Owens v. Twomey, 508 F.2d 858, 865 (7th Cir. 1974).

The case of People v. Kluppelberg, 257 Ill. App. 3d 516 (1993), is particularly instructive here. The Kluppelberg case involved a March 24, 1984, arson at 4448 South Hermitage Avenue in Chicago that claimed the lives of six Luperico family members.

On December 24, 1987, Chicago police detectives investigated two car fires that had occurred at 820 West Belle Plaine Avenue in Chicago. The fires had been reported by the defendant, who worked at that location as a security guard. On January 12, 1988, the defendant was brought to the Chicago police's bomb and arson office to be interviewed about those fires and to view photographs of arson suspects to identify the individual he claimed to have seen running from the scene. During the interview, the defendant admitted to setting fire to the cars himself, as well as starting several other fires. Further, the defendant admitted to starting the fatal fire at 4448 South Hermitage Avenue. An ASA was called, and the defendant provided a brief oral statement admitting that he set that fire. On January 27, 1988, the defendant was indicted for the six killings and the arson that caused them.

Prior to trial, the defendant filed a motion in limine to exclude the testimony of certain witnesses. The reasoning behind the motion was that, but for an illegally obtained confession, the police would not have known of these witnesses, and they would not have been questioned and presented to the grand jury. The court ruled that two of the witnesses, Dawn Gramont and Dwayne Glassco, had been previously known to the police, and denied the defendant's motion as to them, but

granted it as to a third witness, Michelle Briton.

The defendant was found guilty by jury and sentenced to life imprisonment. On appeal, the defendant argued that the testimony of Gramont and Glassco was improperly admitted and that without their testimony he could not have been convicted. He asserted that the 1984 fire investigation was reopened only because of his illegally obtained statement and that the challenged evidence was not attenuated from that illegality.

The Kluppelberg court held that the circuit court properly ruled that the testimony of Gramont and Glassco did not violate the fruit of the poisonous tree doctrine based upon the following:

> "Gramont and Glassco were both named in 1984 police reports. [The]
> defendant had been a suspect in the Hermitage arson because of an
> anonymous tip. When he again came to police attention because of a
> 1987 arson which he reported, that fact alone was enough for the
> police to reopen the earlier investigation and contact potential
> witnesses." Kluppelberg, 257 Ill. App. 3d at 529.

In this case, the police obtained the names of pertinent witnesses, including Spight, Mays and Harris, prior to defendant's arrest. Defendant concedes this point, as noted above. In 1997, Spight was arrested due to an independent investigation regarding his assault of Rashard Wells. See Daniels, 287 Ill. App. 3d at 483 ("(t)he exclusionary rule need not apply if knowledge of the facts that were illegally obtained is gained from an independent source or independent investigation"). Spight was questioned at that time about the shooting, but was released due to insufficient evidence. He stated

that he was with Pooh Bear on the night of the murder. The 1997 interview of Covington revealed that Pooh Bear, Lil Ed and Q Ball were involved in the shooting. In addition, prior to defendant's arrest, six anonymous individuals placed Pooh Bear at the scene of the murder 25 to 35 minutes prior to the shooting. In 2002, Covington was interviewed again and provided information regarding defendant's whereabouts. Covington's reinterview was corroborated by Leron Harris, who provided the police with incriminating information against Kevin Harris. The interviews of Covington, Leron Harris and Charles Levy also occurred before defendant's arrest. Darring's father also provided the police with a tip prior to defendant's arrest that Kevin Harris may have been the person that shot and killed his son. Finally, the police determined that the real name of Lil Ed was Edward Island, Pooh Bear was Djuan Mays and Q Ball was Kevin Harris before defendant was picked up and questioned.

In sum, the information gleaned from the independent investigation of Spight, the interviews of Covington, Leron Harris and Levy, anonymous tips and the tip provided by Darring's father have no nexus to defendant's illegal arrest since all occurred prior to his arrest. The information provided by these sources included the discovery of three witnesses, Spight, Mays and Harris, before the illegal arrest. Satisfaction of one of the exceptions to the fruit of the poisonous tree doctrine, in this case, evidence discovered from an independent source, removes the evidence in question, i.e., the statements and grand jury testimony of these witnesses, from the purview of the fruit of the poisonous tree doctrine. Accordingly, we find the contested statements and grand jury testimony of Spight, Mays and Harris were not obtained by the exploitation of the illegal arrest and by means sufficiently distinguishable to be purged of the primary taint of the illegality. See Wong Sun, 371 U.S. at 488, 9 L. Ed. 2d at 455, 83 S. Ct. at 417; Kluppelberg, 257 Ill. App. 3d at 529; Rassmussen,

143 Ill. App. 3d at 16.

The next determination involves the statement and grand jury testimony of Hill and the application of the inevitable discovery doctrine. "The inevitable discovery exception provides that where the record shows by a preponderance of the evidence that the challenged evidence would have inevitably been discovered by lawful means, the evidence is admissible." People v. Harris, 297 Ill. App. 3d 1073, 1085 (1998). The State must establish three criteria for the exception to apply: "(1) the condition of the evidence must be the same when found illegally as it would have been when found legally; (2) the evidence would have been found by an independent line of investigation untainted by the illegal conduct; and (3) the independent line of investigation must have already begun when the evidence was discovered illegally." Harris, 297 Ill. App. 3d at 1085.

In this case, the discovery of Hill occurred after defendant's illegal arrest. Nevertheless, applying the criteria for the inevitable discovery doctrine in the instant case, the fact that Hill's statement and grand jury testimony mirror the statements and testimony of Spight, Mays and Harris, shows that the condition of the evidence presented by Hill would have been the same whether obtained legally or illegally. Next, as discussed above, independent sources provided information leading to Spight, Mays and Harris, all of which occurred before the illegal action. Hill's statement and grand jury testimony would have inevitably been discovered through the interviews with Spight, Mays and Harris, each of whom named Hill in their statements as a fellow Blackstone gang member who was involved in the murder.

Accordingly, another exception to the fruit of the poisonous tree doctrine applies to Hill's statement and grand jury testimony. We find that, as a result, the contested statement and grand jury

testimony of Hill was not obtained by the exploitation of the illegal arrest and by means sufficiently distinguishable to be purged of the primary taint of the illegality. See Wong Sun, 371 U.S. at 488, 9 L. Ed. 2d at 455, 83 S. Ct. at 417; Kluppelberg, 257 Ill. App. 3d at 529; Rassmussen, 143 Ill. App. 3d at 16.

Based on the foregoing, we find that the State established by clear and convincing evidence that the contested statements and grand jury testimony of Spight, Mays and Harris were attenuated from the initial illegality because those witnesses were discovered from independent sources. In addition, the State showed by a preponderance of the evidence that Hill's statement and grand jury testimony would have inevitably been discovered without an illegal arrest. Accordingly, we find that the contested witnesses' statements and grand jury testimony were properly admitted.

B. Whether Defendant Was Proven Guilty Beyond A Reasonable Doubt

Defendant argues that his conviction for first degree murder was based solely on the prior inconsistent statements and grand jJury testimony of four accomplice-witnesses who gave their statements five years after the murder. Defendant notes that these witnesses testified under a grant of immunity and that each witness recanted his statement. Defendant also pointed out each of the inconsistencies in the evidence from these witnesses. Defendant contends that the totality of these circumstances renders the evidence against him as inherently suspect and insufficient.

The State responds that defendant was proven guilty beyond a reasonable doubt based on eyewitness testimony and other witnesses' corroborating evidence. The State specifically notes the testimony of Mays, an eyewitness to the shooting, proves that defendant committed the murder. The State also points out that the other witnesses' statements and grand jury testimony corroborated

Mays' evidence.

"When a court reviews a challenge to the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." People v. Lee, 376 Ill. App. 3d 951, 954 (2007). "A criminal conviction will not be set aside on appeal unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt." Lee, 376 Ill. App. 3d at 955. In reviewing the evidence, the court will not substitute its judgment for that of the trier of fact. People v. Sutherland, 223 Ill. 2d 187, 242 (2006).

The testimony of a single witness is sufficient to convict if the testimony is positive and the witness is credible. People v. Smith, 185 Ill. 2d 532, 541 (1999). Where the finding of the defendant's guilt depends on eyewitness testimony, a reviewing court must decide whether a fact finder could reasonably accept the testimony as true beyond a reasonable doubt. People v. Cunningham, 212 Ill. 2d 274, 279 (2004). Under this standard, the eyewitness testimony may be found insufficient "only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." Cunningham, 212 Ill. 2d at 280. Although "the testimony of an accomplice witness has inherent weaknesses and should be accepted only with caution and suspicion," such testimony, "whether corroborated or uncorroborated, is sufficient to sustain a criminal conviction if it convinces the [trier of fact] of the defendant's guilt beyond a reasonable doubt." People v. Tenney, 205 Ill. 2d 411, 429 (2002).

In this case, the direct evidence against defendant consisted primarily of the statements and grand jury testimony of Spight, Mays, Harris and Hill, which were published to the jury. The

44

statements and grand jury testimony provided evidence of defendant's and the witnesses' involvement in the murder of Darring. The evidence also showed that the motivation behind the murder of Darring was the presence of Vice Lords in Blackstone territory. Darring was believed to be a member of the Vice Lords street gang. Evidence from the witnesses each described the series of events that culminated in the shooting, which explicitly related the manner in which the group of five Blackstone gang members gathered outside 8125 South Peoria Street to challenge the invitation of a Vice Lord to a party hosted by a Blackstone. The evidence related the manner in which defendant retrieved a weapon from a neighboring Blackstone "muf tiff" and returned with the other witnesses to 8125 South Peoria Street. Mays was an eyewitness to the shooting and provided evidence that he was standing next to defendant as he shot Darring.

Mays' statement and grand jury testimony are sufficient to sustain defendant's first degree murder conviction. In addition, key aspects of the evidence provided by Mays were corroborated by the statements and grand jury testimony of Spight, Harris and Hill.

"It is the function of the trier of fact to resolve any conflicts in the evidence and to assess the credibility of the witnesses." People v. Joya, 319 Ill. App. 3d 370, 381 (2001). Any alleged inconsistencies were minor in nature, fully explored at trial, and do not create a reasonable doubt of defendant's guilt. This court repeatedly has held that a recanted prior inconsistent statement admitted under section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2006)) can support a conviction even in the absence of other corroborative evidence. See People v. Craig, 334 Ill. App. 3d 426, 438 (2002), citing People v. Morrow, 303 Ill. App. 3d 671, 677 (1999); see also People v. Curtis, 296 Ill. App. 3d 991, 999 (1998); People v. Zizzo, 301 Ill.

45

App. 3d 481, 489-90 (1998).

In reviewing all of the evidence in accord with the standard set forth above, we find that a rational trier of fact could have found defendant's guilt beyond a reasonable doubt. Accordingly, defendant's assertion that the State failed to prove him guilty beyond a reasonable doubt is rejected.

### III. CONCLUSION

For the foregoing reasons, we affirm defendant's conviction and sentence.

Affirmed.

GREIMAN and THEIS, JJ., concur.